## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ramon Moreno and Donald O'Halloran, individually and as representatives of a class of similarly situated persons, and on behalf of the Deutsche Bank Matched Savings Plan,<br><br>　　　　　　　Plaintiffs,<br>v.<br><br>Deutsche Bank Americas Holding Corp., Deutsche Bank Americas Holding Corp. Benefits Committee, Deutsche Bank Americas Holding Corp. Executive Committee, Richard O'Connell, Deutsche Investment Management Americas Inc., and John Does 1–40,<br><br>　　　　　　　Defendants. | Case No. 5:15-cv-09936<br><br><br>**CLASS ACTION COMPLAINT** |

### NATURE OF THE ACTION

1.　　Plaintiffs Ramon Moreno and Donald O'Halloran ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the Deutsche Bank Matched Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Plan's fiduciaries: Defendants Deutsche Bank Americas Holding Corp. ("DBAHC"), Deutsche Bank Americas Holding Corp. Benefits Committee ("Benefits Committee"), Deutsche Bank Americas Holding Corp. Executive Committee ("Executive Committee"), Richard O'Connell, Deutsche Investment Management Americas Inc. ("DIMA"), and John Does 1–40.　As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.　Plaintiffs bring this action to remedy this unlawful conduct,

1

prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

3.     Defendants do not act in the best interest of the Plan and its participants.  Instead, Defendants use the Plan as an opportunity to promote the business interests of Deutsche Bank AG and its affiliates and subsidiaries ("Deutsche Bank") at the expense of the Plan and its participants.

4.     For example, the Plan had over $300 million invested in the Deutsche Equity 500 Index Fund (which mimics the S&P 500 index) in 2009, 2010, 2011, and 2012, even though the fees for that index fund were **eleven times higher** than a comparable index fund from Vanguard that had the identical mix of investments.  Despite the obvious imprudence of this proprietary index fund, Defendants retained this fund in the Plan until February 2013 (when it was belatedly removed), costing Plan participants millions of dollars in investment management fees that went directly into Deutsche Bank's pocket.

5.     In addition, the Plan had hundreds of millions of dollars invested in other actively-managed proprietary funds that had significantly higher fees than comparable funds and a track record of poor performance.  In 2009, 2010, 2011, and 2012, Deutsche Bank rated among the worst-performing mutual fund companies in the United States over the prior five- and ten-

year periods, and funds within the Plan such as Deutsche[1] Capital Growth and Deutsche Large Cap Value consistently underperformed their benchmark indices.  Notably, as of the end of 2014, **not a single defined contribution plan** other than the Plan included these funds among its investment offerings – every other fiduciary had either avoided these funds entirely or removed them given their obvious imprudence.  Yet, despite the overwhelming evidence that these funds and other proprietary funds in the Plan were imprudent, Defendants failed to remove these proprietary funds from the Plan.  Defendants' failure to remove these imprudent proprietary mutual funds from the Plan has cost Plan participants tens of millions of dollars in excess fees and lost earnings compared to prudent alternatives.

6.     Further, Defendants compounded their imprudence by failing to procure the least expensive available share class for several mutual funds within the Plan.  For example, Defendants retained so-called institutional shares of the Deutsche Capital Growth Fund and Deutsche High Income Fund with expense ratios of 0.71% and 0.69%, respectively, even though otherwise identical R6 shares of the same funds became available in August 2014 and had lower expense ratios of 0.60% and 0.62%.  In addition, Defendants retained share classes in other funds that were more expensive than alternative share classes from the same funds.  A prudent investor would not have retained these more expensive share classes when other less expensive share classes were available.

7.     Finally, Defendants failed to investigate the use of separate accounts and collective trusts as alternatives to mutual funds, even though they are typically less expensive and offer the same types of investments.  For example, the Plan remained invested in the

---

[1] Deutsche Bank's proprietary mutual funds were named DWS funds until August 2014, when they were renamed the Deutsche funds.  For purposes of consistency and clarity, the Complaint shall refer to these funds as having been named "Deutsche" from 2009 to the present.

Deutsche Capital Growth mutual fund, which had an expense ratio of 0.71% in 2014, even though Deutsche Bank offered its institutional clients a separately-managed account in the same investment style that was significantly less expensive and would have cost only 0.43% per year, based on the amount invested by the Plan.

8.     These imprudent investment choices were not the result of mere negligence or oversight.  To the contrary, Defendants consistently included proprietary Deutsche Bank mutual funds in the Plan, and failed to timely remove those funds even after it was clear that they were imprudent, because Deutsche Bank earned millions of dollars in investment management fees by retaining them in the Plan.   By doing so, Defendants breached their duty of loyalty, as well as their duty of prudence, in violation of 29 U.S.C. § 1104.

9.     Moreover, Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1104.

10.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), engaging in prohibited transactions with a party-in-interest (Count Two), engaging in prohibited transactions with a fiduciary (Count Three), failure to monitor fiduciaries (Count Four), and equitable restitution of ill-gotten proceeds (Count Five).

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

12.     This case presents a federal question and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

13.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

14.     Plaintiff Ramon Moreno resides in Rockville Centre, New York, and was a participant in the Plan until 2010, when his account balance was distributed from the Plan. Moreno is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Moreno was invested in three different funds offered within the Plan within the past six years (Deutsche High Income, Deutsche RREEF Real Estate Securities, Deutsche Bank Stable Value), all three of which were proprietary. Moreno has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

15.     Plaintiff Donald O'Halloran resides in Bayonne, New Jersey, and was a participant in the Plan until July 2015, when his account balance was distributed from the Plan. O'Halloran is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. O'Halloran was invested in seven of the Plan's core investment options between November 2009 and July 2015, including three that were managed by Deutsche Bank (Deutsche Equity 500 Index, Deutsche Capital Growth, Deutsche Large Cap Value). O'Halloran has

suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

## THE PLAN

16.     The Plan was established on October 1, 1993 through the merger of three different Deutsche Bank plans.  On January 1, 2005, the Plan name was changed from the "Deutsche Bank Americas Holding Corp. Matched Savings Plan" to the "Deutsche Bank Matched Savings Plan."  The Plan was amended and restated effective January 1, 2009.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

18.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

19.     The Plan covers all eligible employees of Deutsche Bank-owned subsidiaries within the United States.

20.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis.  The employer often matches those contributions up to a certain percentage of the compensation contributed by the employee each pay period.  Within the Plan, employees may defer anywhere from 1% to 40% of their compensation on a pre-tax basis (subject to annual contribution limits), and Deutsche Bank matches those contributions up to either 4% or 5% of the employee's salary, depending upon the employee's hire date.

21.     Participants in a defined-contribution plan are responsible for directing the investment of these contributions, choosing from among a lineup of options offered by the Plan. Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").  As a result,

the investment lineup determined by the Plan's fiduciaries is critical to participants' investment results and ultimately the retirement benefits they receive.

**DEFENDANTS**

22.     DBAHC is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). DBAHC provides the funding for the Plan while allocating the cost to other American Deutsche Bank entities based upon their headcount.   DBAHC is headquartered in New York City. DBAHC is responsible for overseeing the administration of the Plan and ensuring that the Plan's other fiduciaries are performing their duties in accordance with the Plan document and in compliance with ERISA.   Through its executive committee, officers, directors, employees, affiliates, subsidiaries, and committees, DBAHC exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility in the administration of the Plan and in causing the Plan to retain proprietary Deutsche Bank mutual funds.  DBAHC is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

23.     In addition, the Plan's Form 5500s for 2009 through 2014 (filed with the United States Departments of Labor and Treasury) state that DBAHC is the Plan Administrator.  To the extent that this representation in the Form 5500s is accurate,[2] DBAHC is also a fiduciary by virtue of its position in regards to the administration of the Plan.  *See* 29 C.F.R. § 2509.75-8 at D-3.   Further, as the sponsor of the Plan, and a participating employer in the Plan, DBAHC is a "party in interest" under 29 U.S.C. § 1002(14).

24.     In any event, regardless of whether it is a fiduciary, DBAHC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), based on its knowing participation in

---

[2] The Plan's financial statements filed with those forms state that the Benefits Committee is the Plan Administrator.  *See infra* at ¶ 25.

prohibited transactions, its knowing receipt of payments made in breach of the other Defendants' fiduciary duties, and the unlawful inurement of Plan assets to its benefit as a Plan employer, all described in more detail below.

25.     The Benefits Committee is identified in the Plan document and the Plan's financial statements as the administrator of the Plan.  As a result, the Benefits Committee is a fiduciary by virtue of its administrative position, *see* 29 C.F.R. § 2509.75-8 at D-3, and is also a named fiduciary pursuant to 29 U.S.C. § 1102(a).  Further, both the Benefits Committee and the current and former members of the Benefits Committee are fiduciaries given the nature of authority they exercised over the Plan.  *See* 29 U.S.C. § 1002(21)(A).  The Benefits Committee controls and manages the operation and administration of the Plan, including the selection of investments within the Plan.  As a result, the Benefits Committee exercises discretionary control or responsibility over management or administration of the plan, and discretionary control or authority regarding Plan assets.  Other than Defendant O'Connell, the relevant current and former members of the Benefits Committee are not currently known to Plaintiffs, and therefore are collectively named John Does 1–10.

26.     Defendant Richard O'Connell is a member of the Benefits Committee and has signed on behalf of DBAHC as the Plan Administrator on the Plan's Form 5500s for 2009 through 2014.  As a member of the Benefits Committee, O'Connell possessed discretionary authority and responsibility in the administration of the Plan, exercised discretionary authority or control respecting management of the Plan, and exercised authority or control respecting management or disposition of Plan assets.  Accordingly, O'Connell was a fiduciary at all relevant times pursuant to 29 U.S.C. § 1002(21)(A).

27.     The Executive Committee is responsible for monitoring the activities of the

Benefits Committee and for appointing and removing members of the Benefits Committee. The Executive Committee is also responsible for overseeing the Benefits Committee and ensuring that the Plan is being administered in compliance with ERISA. The Executive Committee is a named fiduciary of the Plan pursuant to 29 U.S.C. § 1102(a). The Executive Committee and its members possessed discretionary authority and responsibility with respect to the administration of the Plan, exercised discretionary authority or control respecting management of the Plan by appointing and monitoring the members of the Benefits Committee, and exercised authority or control respecting management or disposition of Plan assets through their actions and omissions. Accordingly, the Executive Committee is also a fiduciary pursuant to 29 U.S.C. § 1002(21)(A). Because the current and former members of the Executive Committee are not currently known to Plaintiffs, they are collectively named as John Does 11–30.

28.    DBAHC, the Benefits Committee and its members, and the Executive Committee and its members possess the authority to delegate their responsibilities to any other person or persons. Any individual or entity to whom these Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because the individuals and/or entities that have been delegated fiduciary responsibilities by Defendants are not currently known to Plaintiffs, they are collectively named as John Does 31–40.

29.    DIMA is a subsidiary of Deutsche Bank AG, is a participating employer in the Plan, and at all relevant times has served as the investment advisor to the Deutsche Bank mutual funds held within the Plan. Under 29 U.S.C. § 1002(21)(A), DIMA is a fiduciary to the Plan because it exercises authority or control respecting management or disposition of Plan assets and because it renders investment advice for a fee or other compensation with respect to monies of

the Plan. Additionally, because it provides services to the Plan, and because its employees are covered by the Plan, DIMA is a "party in interest" under 29 U.S.C. § 1002(14).

30.    In any event, regardless of whether it is a fiduciary, DIMA is also subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3) based on its knowing participation in prohibited transactions, its knowing receipt of payments made in breach of the other Defendants' fiduciary duties, and the unlawful inurement of Plan assets to its benefit as a Plan employer, all described in more detail below.

31.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)    For the exclusive purpose of
>
>    (i)     Providing benefits to participants and their beneficiaries; and
>
>    (ii)    Defraying reasonable expenses of administering the plan;
>
> (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33.     "The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to

the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan*, 680 F.2d at 272 n.8).

### DUTY OF LOYALTY

34.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)). Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271.

### DUTY OF PRUDENCE

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v.*

*Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).  Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litigation II*, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

36.    Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty.  *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).  Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available.  *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015).

### SOURCE AND CONSTRUCTION OF DUTIES

37.    The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828.  Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.; accord La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (explaining that the duty of prudence "is measured according to the objective prudent person standard developed in

the common law of trusts").   In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

38.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship."   Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").   The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, **this emphasis reflects the availability and continuing emergence of modern investment products**, not only with significantly varied characteristics but also **with similar products being offered with significantly differing costs**.  The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.   In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added).  Where markets are efficient, fiduciaries are encouraged to use low-cost index funds.  *Id.* § 90 cmt. h(1).  While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . .   [T]hese added costs . . . must be justified by realistically evaluated return expectations."  *Id.* § 90 cmt. h(2).

### PROHIBITED TRANSACTIONS

39.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106,

and are considered "*per se*" violations because they entail a high potential for abuse. Section

1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

>> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

* * *

>> (C)    furnishing of goods, services, or facilities between the plan and  party in interest;

>> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) further provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –

>> (1)    deal with the assets of the plan in his own interest or for his own account,

>> (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

>> (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**CO-FIDUCIARY LIABILITY**

40.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. §

1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

14

(3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

41.     In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options.  29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.  ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.  Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 day and 30 years), and the default risk associated with the particular borrower.  Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company. Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between).  Balanced funds are a type of mutual fund that invests in a mix of

stocks and bonds.  Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

42.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.  For example, within each of the Deutsche Bank funds in the Plan, DIMA is paid a monthly investment management fee in exchange for directing the investment of the fund's assets.

43.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).  By following this strategy, index funds produce returns that are very close to the market segment tracked by the index.  *Id.*  Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses.  *Id.*  Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection.  *Id.* at 485–86.  Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized).  U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

44.     In addition to a core menu of investment options, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds.  Ayres &

Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c).  However, SDBAs have significant drawbacks.  For example, participants can be assessed trading fees that can make an SDBA a more expensive option compared to investing in the Plan's core options.  Costs are also higher because employees investing in mutual funds within an SDBA must invest in retail mutual funds, rather than lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets.  DOL Field Assistance Bulletin 2012-02R (July 30, 2012), *available at* http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?, Fiduciary News (June 11, 2013), *available at* http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/.

45.     The existence of an SDBA option does not excuse plan fiduciaries from selecting a prudent and appropriate set of core investment options.  For the reasons described above (among others), "the performance is generally lower with self-directed accounts compared to managed portfolios.  This translates into low real rates of return and higher retirement failure rates."  Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, THE DAILY RECORD (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/; Dr. Gregory Kasten, Self-Directed Brokerage Accounts Reduce Success (2004), at 1, 13–14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of study showing that self-directed brokerage accounts lag the performance of a model portfolio of the plan's core investment options by an average of 4.70% per year).

17

46.     In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options.  Due to their high costs and administrative complexity, SDBAs are seldom used by participants: only 2% of retirement plan assets are held in SDBAs.  Investment Company Institute & Deloitte Consulting LLP, Inside the Structure of Defined Contribution/401(k) Plan Fees,        2013,       at        15       (Aug.       2014),       *available       at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf   (hereinafter   "ICI/Deloitte   Study").  Consistent with this experience, less than 2% of the Plan's assets were held in SDBAs as of the end of 2014.

MINIMIZATION OF PLAN EXPENSES

47.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses."  *Tibble*, 135 S. Ct. at 1826.  Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account.  Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement.  *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[3] to 50 bps [within

---

[3] The term "bps" is an abbreviation of the phrase "basis points."  One basis point is equal to .01%, or 1/100th of a percent.  Thus, a fee level of 100 basis points translates into fees of 1% of

a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

48.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses.  ICI/Deloitte Study at 17. Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*  On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

49.     Administrative expenses (e.g., recordkeeping, trustee and custodial services, employee education, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing."  Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16.  These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula.  Though revenue sharing arrangements do not generally constitute prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in

---

the amount invested.      *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Nov. 11, 2015).

which to invest or make available to plan participants and beneficiaries in self-directed plans."
U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

50.     Fiduciaries exercising control over administration of the plan and the selection of core investment options can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options.  This task is made significantly easier the larger a plan gets.  Economies of scale generally result in lower administrative expenses on a per-participant or percentage-of-assets basis.  ICI/Deloitte Study at 7, 21.  Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors.  *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").  Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.33% for plans with over $1 billion in assets.  ICI Study at 41.

51.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans.   *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

### SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR THE PLAN

52.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan.   The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

53.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L.

Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).

54.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should.  John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

55.     For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

56.     The second critical insight provided by academic and financial industry literature is that in evaluating prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.  Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.  Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org.

871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan,

*Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent

predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through
> higher expense ratios. On the contrary, it appears that the effect of expenses on
> after-expense performance (even after controlling for funds' observable
> characteristics) is more than one-to-one, which would imply that low-quality
> funds charge higher fees. Price and quality thus seem to be inversely related in the
> market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

57.     While high-cost mutual funds may exhibit positive, market-beating performance

over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a

particular period is not predictive of whether a mutual fund will perform well in the future.

Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in

Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund

Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and

concluding that "persistent differences in mutual fund expenses and transaction costs explain

almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the

market that managers might demonstrate is typically dwarfed by mutual fund expenses. Eugene

F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*,

65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical

Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin.

1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual

fund returns is that the worst-performing mutual funds show a strong, persistent tendency to

continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

Therefore, regardless of where one comes down on the issue of active versus passive investing, a

prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses.  *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN

**I.     DEFENDANTS FAILED TO PROMPTLY REMOVE IMPRUDENT PROPRIETARY INDEX FUNDS**

58.     The marketplace for retirement plan services is well-established and highly competitive.  Billion dollar plans such as the Plan wield tremendous bargaining power and can obtain high-quality investment management and administrative services at very low costs.

59.     As of the end of 2009, the Plan had approximately $1.9 billion in assets, and offered participants 22 core investment options, as well as a self-directed brokerage account option.  Ten of the Plan's 22 investment options were proprietary Deutsche Bank mutual funds. Three of these ten proprietary funds were index funds, while seven were actively managed.

60.     An index fund is a passive investment which attempts to mimic the performance of a market index rather than making subjective determinations about the merits of particular stocks or bonds.  A prudent investor seeking to invest in a fund that mimics a particular index or market will therefore select whichever fund tracks that particular market or index at the lowest cost.  *See* Gail Marks-Jarvis, *Step-by-Step Guidance on Shopping for Index Funds*, Chicago Tribune (Aug. 16, 2015), *available at* http://www.chicagotribune.com/business/yourmoney/ct-marksjarvis-0816-biz-20150814-column.html; Jim Mitchell, *Investors Should Choose Index Funds with the Lowest Fees*, TheStreet (Mar. 10, 2015), http://www.thestreet.com/story/13072023/3/investors-should-choose-index-funds-with-the-lowest-fees.html.

61.     The Deutsche Equity 500 Index Fund attempts to mimic the performance of the Standard & Poor's 500 Index, known as the S&P 500.   In 2009, institutional shares of the Deutsche Equity 500 Index Fund had an expense ratio of 0.23%, meaning that investors in the fund paid fees of 0.23% per year to invest in the fund.  Based on this expense ratio and the Plan's investment in this fund as of the end of 2009, the Plan could reasonably surmise as of the end of 2009 that participants would pay approximately $717,000 in expenses in 2010, plus whatever additional fees were assessed based on additional investments in the fund and increases in the fund's value.

62.     A minimal investigation conducted at the end of 2009 would have revealed that the Plan could have instead invested in Institutional Plus shares of the Vanguard Institutional Index Fund, which also seeks to mimic the performance of the S&P 500, and as of the end of 2009 carried an expense ratio of only 0.02%.   Had the Plan instead invested in the Vanguard Institutional Index Fund, Plan participants would have paid only $64,400 in fees in 2010.  The Plan did not make this change as of the end of 2009, however, and therefore **Plan participants paid more than eleven times more in fees** than they would have had the Plan prudently removed the Deutsche Equity 500 Index Fund from the Plan as of the end of 2009 and invested instead in Institutional Plus shares of the Vanguard Institutional Index Fund.

63.     The Deutsche Equity 500 Index Fund became more imprudent with each year. While the Vanguard Institutional Index Fund's expenses remained 0.02%, the expense ratio of the Deutsche fund increased each year, from 0.23% in 2010, to 0.24% in 2011, 0.25% in 2012, and finally 0.31% in 2013.  The Plan's investment in the fund also increased over time.  The Plan's balance in the Deutsche Equity 500 Index Fund was $312 million as of the end of 2009; $355 million as of the end of 2010; $345 million as of the end of 2011; and $388 million as of

the end of 2012.  Plan participants therefore paid approximately $745,000 in excess fees in 2010; $759,000 in 2011; and $892,000 in 2012.

64.     Each year, beginning as of the end of 2009, an impartial review of the Plan's investment options coupled with a minimal investigation of available alternatives would have led a prudent investor to remove the Deutsche Equity 500 Index Fund from the Plan, and replace it with a lower cost index fund such as the Vanguard Institutional Index Fund.[4]  Defendants' failure to take this action constituted a breach of their fiduciary duties of prudence and loyalty.  *See Leber v. Citigroup 401(k) Plan Investment Committee*, 2014 WL 4851816, at *4 (S.D.N.Y. Sept. 30, 2014) ("Essential to the plausibility of plaintiffs' [breach of fiduciary duty] claims was the allegation that the [proprietary funds] charged higher fees than those charged by comparable Vanguard funds—in some instances fees that were more than 200 percent higher than those comparable funds.") (quotation and citation omitted).  Finally, in February 2013, Defendants removed the Deutsche Equity 500 Index Fund and other proprietary index funds from the Plan and replaced them with comparable Vanguard index funds, but did not reimburse Plan participants for the excess fees they had been paying for the past several years.

65.     The Plan attempted to conceal its imprudence from Plan participants.  The Plan provides participants with quarterly statements that summarize the performance of each Plan participant's investments and include a summary of the investment offerings within the Plan. The statements also contain a section entitled "Plan News," which is meant to provide participants with relevant information regarding changes in the Plan.  For example, at the end of 2009, the Plan News section informed investors that beginning December 1, 2009, the Plan

---

[4] A prudent investor similarly would have replaced other Deutsche Bank proprietary index funds with other less expensive index funds offering the same investment mix.

would be providing participants with four-page summary prospectuses in lieu of full-length annual prospectus updates.

66.     The quarterly statement for the period ending March 31, 2013 made no mention of the Plan's removal of the Deutsche Bank proprietary index funds or the Plan's addition of the Vanguard index funds.   The only news items pertained to the name change from DWS Investments to Deutsche Asset & Wealth Management, and a change to the name and management team of the Deutsche Global Growth Fund.   This omission prevented Plan participants from learning of the Plan's imprudence in retaining the Deutsche index funds for the past several years, and furthermore obscured the fact that the index funds being added were nearly identical to those being replaced, with the only difference being the substantially lower costs charged by the Vanguard index funds.

## II.   DEFENDANTS RETAINED HIGH COST AND POORLY PERFORMING FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

67.     In addition to the Plan's retention of imprudent index funds, the Plan has retained several actively-managed proprietary funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence that these proprietary funds had become imprudent and were likely to perform poorly in the future.

68.     The fact that these funds were imprudent investment options is not merely evident with the benefit of hindsight.   Rather, it should have been evident from the information already available to Defendants at the relevant times that these funds were imprudent and inappropriate. The fact that Defendants retained these funds in spite of this contemporaneously-available evidence further demonstrates that the process by which the Plan was managed was deeply flawed.

69.     For example, as of the end of 2009, the Plan had approximately $77 million in the Deutsche Capital Growth Fund; $15 million in the Deutsche Global Growth Fund; $70 million in the Deutsche Large Cap Value Fund, $51 million in the Deutsche Core Fixed Income Fund, and $20 million in the Deutsche High Income Fund.

70.     In 2009, in plans with over $1 billion in assets, the average expense ratio for domestic equity funds was 0.56%; for domestic bond funds it was 0.38%; and for international equity funds it was 0.77%.   ICI Study at 46.   The expense ratios for the actively-managed proprietary funds within the Plan were higher.   The Plan's two domestic equity offerings, the Large Cap Value and Capital Growth Funds, carried expense ratios of 0.57% and 0.73%, respectively.   The two bond offerings, the Core Fixed Income Fund and High Income Fund, carried expense ratios of 0.55% and 0.67%, respectively.   And the Global Growth Fund carried an expense ratio of 1.13%.

71.     This gap between the expenses charged by the average fund and the expenses charged by the Deutsche Bank proprietary funds grew larger as the proprietary funds became more expensive while mutual fund expenses industry-wide dropped significantly.   For example, in 2012, for plans with over $1 billion in assets, the average domestic equity fund had an expense ratio of 0.48%.   The average domestic bond fund charged 0.35%.   And the average international equity fund charged 0.64%.   Yet, as of the end of 2012, the Plan's two domestic equity offerings, the Large Cap Value and Capital Growth Funds, carried expense ratios of 0.67% and 0.70%, respectively.   The two bond offerings, the Core Fixed Income Fund and High Income Fund, carried expense ratios of 0.68% and 0.66%, respectively.    And the Global Growth Fund carried an expense ratio of 1.20%.

72.     The above comparisons actually understate the excessiveness of the investment

management fees paid by the Plan's participants.  As an example, the fees in the Plan were many times higher than the fees in comparable institutional mutual funds from Vanguard, which many similar plans offer.  Indeed, as shown by the chart below, the fees for funds within the Plan were *more than 10 times more expensive* than alternatives from Vanguard in the same investment style:

| Fund in Plan | Expense ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Deutsche Capital Growth Instl (SDGTX) | 71 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 787% |
| Deutsche Large Cap Value Instl (KDCIX) | 68 bps | Vanguard Value Index Instl (VIVIX) | 8 bps | Large Value | 750% |
| Deutsche Global Growth Instl (SGQIX) | 115 bps | Vanguard Total World Stock Index I (VTWIX) | 15 bps | World Stock | 667% |
| Deutsche High Income Instl (KHYIX) | 69 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | High-Yield Bond | 431% |
| Deutsche Core Fixed Income Instl (MFINX) | 64 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Intermediate-Term Bond | 967% |

73.    Despite the high cost of the proprietary investments within the Plan, and the gradual increase of those costs after 2009, Defendants failed to remove the high-cost proprietary mutual funds from the Plan in favor of lower-cost non-proprietary investments such as the Vanguard funds listed above, even as the fees associated with non-proprietary investment options declined.  This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

74.     Defendants also failed to conduct an impartial review of the performance of each of the proprietary mutual funds, and of the Deutsche Bank funds as a whole, to determine whether it remained prudent for the Plan to retain these proprietary funds.

75.     Had Defendants conducted such a review, it would have revealed that Deutsche Bank had been one of the worst performing mutual fund families in the United States for several consecutive years.  In 2009, 2010, 2011, 2012, and 2013, Deutsche Bank was rated among the worst mutual fund companies over the past 5- and 10-year periods according to Barron's.[5]  These institutional performance figures are important in deciding which investments to retain within a Plan and which investments to remove.  Though each mutual fund might generally have different managers, those managers typically rely upon the same institutional infrastructure including analysts, data, research, and senior management oversight.   An impartial review of the performance of Deutsche Bank's mutual funds in 2009 and an adequate investigation of available alternatives each year thereafter would have led a prudent investor to remove the Deutsche Bank mutual funds from the Plan given the institution's demonstrably poor track record.  *See Pension Benefit Guar. Corp. ex rel. St. Vincent Med. Ctrs. Ret. Plan v. Morgan*

---

[5] *See* http://s.wsj.net/public/resources/documents/BA-Waddell100201.pdf (2009 Barron's mutual fund rankings with Deutsche Bank ranked 38 out of 54 fund families over the past five years and 38th out of 48 companies over the past ten years); http://www.barrons.com/articles/SB50001424052970204620604576116293104462736   (2010 Barron's mutual fund family rankings with Deutsche Bank ranked 45th out of 53 fund families over the past five years and 41st out of 46 fund families over the past decade); http://www.barrons.com/articles/SB50001424052748703837504577195012375534598   (2011 rankings showing Deutsche Bank 50th out of 53 mutual fund families over the past five years and 42nd out of 45 companies for the past ten years); http://www.barrons.com/articles/SB50001424052748704372504578284113281612952 (Barron's 2012 rankings showing Deutsche Bank 51st out of 53 fund families over the past five years and 41st out of 46 fund families over the past decade); http://www.barrons.com/articles/SB50001424053111904710004579364970231787840 (Barron's 2013 rankings showing Deutsche Bank ranked 51st out of 55 fund families over the past five years and 41st out of 48 fund families over the past decade).

*Stanley Inv. Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013) (hereinafter "*PBGC*") (providing that a fiduciary breaches the duty of prudence if a superior investment alternative was available and an adequate investigation would have revealed the existence of that alternative).

76.    Evidence of these institution-wide problems could also be seen in the performance of individual Deutsche Bank funds within the Plan.  Two examples are particularly telling.  The Deutsche Capital Growth Fund is currently a core investment option within the Plan, and has been since at least 2009.  The managers of the Deutsche Capital Growth Fund left Deutsche Bank in 2009, and the new manager had no public record managing money.  The new manager underperformed the fund's benchmark index in 2009 by over 11 percent.  A prudent, impartial fiduciary would have removed the Capital Growth fund from the Plan at the end of 2009 in light of the unproven new manager and his poor performance since taking over the fund. Defendants failed to take this action.  The Capital Growth fund underperformed its benchmark index again in 2010.  According to the fund's annual report, as of September 30, 2010, the Capital Growth Fund had underperformed its index over the past 1-year, 3-year, and 5-year periods.  Given this information, a prudent and impartial fiduciary reviewing the Capital Growth Fund in 2010 would have removed the fund from the Plan and replaced it with either an index fund or a lower-cost actively managed fund with a superior track record.  *See* Restatement § 90 cmt. b, h(1)–(2); *PBGC*, 712 F.3d at 719.  Defendants' failure to remove the Capital Growth Fund at the end of 2009 or during 2010 cost Plan participants millions of dollars due to the resulting poor performance of the fund.  By the end of 2014, of the more than 1,400 defined contribution plans with over $500 million in assets (the Plan had nearly $2.9 billion in assets as of the end of 2014), only one defined-contribution plan included the Deutsche Capital Growth Fund among its core investment options: the Deutsche Bank Matched Savings Plan.

77.    The Deutsche Large Cap Value Fund has suffered similarly poor performance, although the investment's poor performance didn't become apparent until 2010, when the fund underperformed its benchmark index by nearly 5 percent.  The fund again underperformed its benchmark index in 2011 and 2012.  Given three consecutive years of underperformance, it should have been apparent to the Plan's fiduciaries that the Large Cap Value fund was no longer a prudent investment.  However, the Plan's fiduciaries did not conduct an impartial review of the Plan's investments in 2012, and the Large Cap Value Fund remained in the Plan.  The fund underperformed its benchmark index again in 2013, the fourth consecutive year of underperformance.  Given the Large Cap Value Fund's high costs and its poor track record over all relevant time periods, an impartial fiduciary reviewing the Plan's investments in 2013 would have removed the Large Cap Value Fund.  Defendants failed to remove this imprudent investment in 2011, 2012, and 2013, and as a result of this fiduciary breach, Plan participants have lost tens of millions of dollars that they would have earned in a lower-cost, prudent alternative such as an index fund.  By the end of 2014, of the more than 1,400 defined contribution plans with over $500 million in assets, only one defined contribution plan included the Deutsche Large Cap Value Fund among its core investment options: the Deutsche Bank Matched Savings Plan.

78.    Given the excessive fees charged by the actively-managed Deutsche Bank mutual funds and the funds' poor performance, DIMA's compensation for managing these funds greatly exceeded an amount that would have been reasonable.

79.    Based on the above facts, it is apparent that Defendants' process for reviewing Plan investments was deeply flawed.  Defendants failed to evaluate the institutional capabilities and track record of each investment within the Plan.  Defendants showed favoritism towards

Deutsche Bank mutual funds, avoiding removal of Deutsche Bank funds wherever possible. Even when Defendants did remove proprietary funds from the Plan, the action was taken years after a prudent and impartial fiduciary would have taken the same action. Defendants failed to monitor the portfolio to determine whether there had been turnover among the managers of each fund. And Defendants failed to periodically re-assess the long-term performance record of each Plan investment to ensure that the investment remained prudent. Accordingly, it can be reasonably inferred that the process by which the Plan was managed was flawed. *PBGC*, 712 F.3d at 718 (holding that a claim for a breach of the duty of prudence is rendered plausible where the circumstantial facts reveal that the plan's investment management process was flawed).

80.     Had Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, Defendants would have removed the Deutsche Bank mutual funds from the Plan in favor of investments such as the Vanguard funds listed above that offered similar or superior performance at significantly less expense. Instead, Defendants retained the Deutsche Bank funds because they were producing significant revenue for Deutsche Bank, and the Plan assets within each fund provided the proprietary Deutsche Bank funds with superior economies of scale with which to appear more competitive in the marketplace. By prioritizing Deutsche Bank's interests over Plan participants, Defendants breached the duties of loyalty and prudence.

### III.    DEFENDANTS FAILED TO USE THE LOWEST COST SHARE CLASS OF SEVERAL MUTUAL FUNDS IN THE PLAN

81.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, the more expensive share classes are targeted at smaller investors with less bargaining power, while the lower-cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater

bargaining power.  There is no difference between share classes other than the cost—the funds hold identical investments and have the same manager.

82.    Large defined contribution plans such as the Plan have sufficient assets and negotiating power to qualify for the lowest cost share class available.  A fiduciary to a large defined contribution plan such as the Plan can use its asset size to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will select the lowest-priced share class available.

83.    In several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available.

84.    For example, throughout the statutory period, the Plan has held institutional-class shares of all Deutsche Bank funds within the Plan.  Up until 2014, institutional-class shares represented the lowest-cost share class of Deutsche Bank funds available.  In August 2014, however, Deutsche Bank mutual funds introduced a new, lower-cost R6 share class for several of its funds, including three funds held by the Plan—Deutsche Capital Growth, Deutsche High Income, and Deutsche Real Estate Securities.  As of the end of 2014, the Plan held approximately $280 million in these three funds.  The chart below shows the expense ratio of each fund's R6 share class compared with the institutional shares the Plan is invested in:

|  | Exp. Ratio of Institutional Shares | Exp. Ratio of R6 Shares |
|---|---|---|
| Deutsche Capital Growth | 0.71% | 0.60% |
| Deutsche High Income | 0.69% | 0.62% |
| Deutsche Real Estate Securities | 0.63% | 0.55% |

85.    By failing to transfer the Plan's assets in these three funds into R6 shares when they became available in August 2014, from August 2014 to the present Deutsche Bank has dealt

with the Plan on a basis that is less favorable to the Plan than its dealings with other shareholders of Deutsche Bank mutual funds.

86.     Because DIMA, a Plan employer and fiduciary, introduced the R6 shares, the Plan knew or should have known of the existence of R6 shares immediately upon their introduction in August 2014, and therefore also should have immediately known of the prudence of transferring the Plan into R6 shares.

87.     A prudent fiduciary conducting an impartial review of the Plan's investments in late 2014 would have transferred the Plan's investments in these three funds into R6 shares.  Yet despite the availability of the lower-cost R6 shares, Defendants did not transfer Plan holdings in any of these three funds from institutional shares into R6 shares, in breach of their fiduciary duties.

88.     The Plan also has been invested in institutional shares of the Lord Abbett Developing Growth mutual fund since 2011.  As of the end of 2014, the Plan had $170 million invested in the Developing Growth fund.  In June 2015, Lord Abbett introduced R6 shares of the Developing Growth fund that cost significantly less than the institutional shares: the institutional shares have an expense ratio of 0.73%, while the R6 shares have an expense ratio of only 0.60%. A prudent fiduciary conducting a quarterly review of Plan investments would monitor the Plan's expenses to ensure that the Plan is invested in the lowest-cost mutual fund share class available. Yet, Defendants failed to monitor the Plan's investments to ensure that the Plan was invested in the lowest-cost share class available, and have not transferred the Plan's investment in the Lord Abbett Developing Growth fund into R6 shares of the fund.

89.     In addition, the Plan had approximately $103 million invested in institutional shares of the Goldman Sachs Mid Cap Value Fund at the end of 2014.  On July 31, 2015,

Goldman Sachs introduced R6 shares, a new, lower-cost class of shares. For 2015, the expense ratio of R6 shares was 0.72%, compared with an expense ratio of 0.74% for institutional shares. A prudent fiduciary conducting a quarterly review of Plan investments would have discovered that a lower-cost share class was available, and would have transferred the Plan's investment in the Goldman Sachs Mid Cap Value Fund from institutional shares into R6 shares of the fund. However, Defendants failed to do so.

90.     As a further example, in 2009, the Plan added the MFS Value Fund as a core investment option and invested in the R4 shares, which had an expense ratio of 0.77%. At the time, R4 shares were the cheapest share class available of the MFS Value Fund. In 2012, MFS introduced the R5 share class of the MFS Value Fund, and it charged only 0.60%, while the R4 shares in 2013 charged 0.69%. A prudent fiduciary reviewing the Plan's investments in 2012 would have transferred the Plan out of R4 shares and into R5 shares of the MFS Value Fund. However, Defendants failed to conduct such a review. As of the end of 2014, the Plan's $19 million invested in the MFS Value Fund remains invested in R4 shares of the Fund, despite the fact that R4 shares have an expense ratio of 0.65%, and the R5 shares charge investors only 0.55%.

## IV.   DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

91.     Aside from selecting proprietary mutual funds that charged excessive fees and had a track record of poor performance, Defendants also failed to adequately investigate non-mutual fund alternatives such as collective trusts and separately managed accounts.

92.     According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, are available to "large plans … with total assets of over $500 million[.]"  *Study of 401(k) Plan Fees and Expenses*,

April 13, 1998.  By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  *Id*.

93.     Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees and greater control by the plan sponsor or fiduciary over the investment guidelines.

94.     While certain of the Plan's options used institutional share classes, costs within separate accounts are typically much lower than even the institutional share class of mutual funds.

95.     For example, Deutsche Bank itself offers its institutional clients separately-managed accounts in the same investment styles as the Plan's proprietary mutual funds, including the Deutsche Large Cap Value, Capital Growth, and Real Estate Securities funds. Deutsche Bank's advertising materials state that the minimum investment for these separate accounts is $25 to $30 million, with fee schedules that decline as assets increase.  The Plan's proprietary funds generally far exceed that threshold; the Plan has over $100 million invested in each of the three proprietary funds mentioned above, for example.

96.     Deutsche Bank's advertised fee schedule for the Large Cap Quality Growth separate account starts at 60 basis points, declines to 50 basis points on incremental assets between $20 and $50 million, declines to 40 basis points on assets between $50 and $100 million, and declines again to 30 basis points on assets over $100 million.  Based on the Plan's $132 million investment in the Deutsche Capital Growth Fund (which has an identical investment objective), the Plan would have paid only 43 basis points under the separate account fee schedule.  Instead, the Plan remained invested in the Capital Growth mutual fund, which

charged investors 71 basis points in 2014.  Thus, Defendants could have reduced the Plan's expenses by approximately 40 percent by converting the mutual fund to a separate account.

97.    Similarly, Defendants could have reduced the expenses paid in the Deutsche Large Cap Value fund from 68 to 47 basis points by converting the mutual fund to the separate account structure advertised by Deutsche Bank to its institutional clients.

98.    Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here. Accordingly, the fee savings that Defendants could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules.

99.    Collective trusts also would have provided much lower investment management fees than the Plan's mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.  According to the investment consulting firm Callan Associates Inc., for plans with over $1 billion in assets, collective trusts charge an average of 54 basis points.  Based upon this average, for each of the Plan's actively managed mutual funds, use of a collective trust structure would have reduced the fees charged to Plan participants by between 10 and 63 basis points.

100.    Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.

By failing to investigate the use of these institutional alternatives for the Plan's actively managed funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

101.    Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, information regarding other available share classes, and information regarding separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Moreover, as noted in Paragraph 65 above, Defendants fraudulently attempted to conceal their imprudence.  Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  For purposes of the Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

102.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).  Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

103.    Plaintiffs Ramon Moreno and Donald O'Halloran assert Counts I–V against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[6]

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All participants and beneficiaries of the Deutsche Bank Matched Savings Plan at any time on or after December 21, 2009, excluding Defendants, other employees with responsibility for the Plan's investment or administrative functions, members of the Board of Directors of Deutsche Bank Americas Holding Corp., and members of the Board of Directors of Deutsche Investment Management Americas Inc.

104.   <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable.  The Plan has had between 19,000 and 22,000 participants with account balances during the applicable period.

105.   <u>Typicality</u>:   Plaintiffs' claims are typical of the Class members' claims.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members with regard to the Plan.  Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

106.   <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

107.   <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.   Whether Defendants are fiduciaries of the Plan;

   b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

   c.   Whether Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1104;

40

     d.   Whether Plan assets unlawfully inured to a Plan employer in violation of 29 U.S.C. § 1103(c)(1);

     e.   The proper form of equitable and injunctive relief; and

     f.   The proper measure of monetary relief.

108.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

109.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests.   The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

110.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct as described in this Complaint applied uniformly to all members of the Class.  Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any

Class members on an individual basis.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

111.  Each of the Defendants is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

112.  29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

113.  The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA.  Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.  This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]"  *Tibble*, 135 S. Ct. at 1829.

114.  As described throughout the Complaint, Defendants failed to monitor the Plan's investments to ensure that each of the Plan's investments remained prudent, removing those that were no longer prudent.  Defendants retained proprietary index funds as Plan investments despite

42

the availability of identical investments from other mutual fund companies that would have cost Plan participants as much as eleven times less than they were charged by the Deutsche Bank proprietary index funds.  Defendants retained proprietary actively-managed funds despite their excessive costs and their poor performance history.  A prudent fiduciary in possession of this cost and performance information would have removed the Deutsche funds from the Plan as early as the end of 2009, and at the very latest by 2012.  Defendants also failed to monitor Plan investments to ensure that the Plan was invested in the lowest-cost share class of each mutual fund within the Plan, and failed to transfer Plan investments into lower-cost share classes when those cheaper share classes became available.  Finally, Defendants failed to investigate the availability of separate accounts and collective trusts for the actively managed mutual funds within the Plan, and subsequently failed to transfer from mutual funds into a separate account structure even though doing so would have saved Plan participants millions of dollars in excess fees.

115.    Each of the above-mentioned imprudent actions and failures to act in a prudent manner demonstrate Defendants' failure to monitor the Plan and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Deutsche Bank.  Similarly, Defendants avoided investigating the availability of separate accounts and collective trusts, because doing so would have reduced the fee revenues received by Deutsche Bank from Plan participants' accounts.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of

administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

116.    Defendants failed to implement an adequate process to monitor the investments within the Plan and remove those investments that had become imprudent.  Defendants selected and retained high-cost proprietary mutual funds, when at all relevant times, much less expensive options of similar or superior quality were available to the Plan.  Defendants also neglected to remove poorly-performing funds from the Plan and failed to consider better-performing alternatives that were readily available to the Plan.  Defendants failed to monitor the Plan to ensure the Plan was invested in the lowest-cost share class available for every mutual fund within the Plan.  Defendants also failed to transfer the Plan from mutual funds into separate accounts or collective trusts, when doing so would have saved Plan participants millions in fees and expenses.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

117.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

118.    Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by

failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### COUNT II
**Prohibited Transactions with Party in Interest**
**29 U.S.C. § 1106(a)(1)**

119. As Plan employers, DIMA and all other American subsidiaries and affiliates of Deutsche Bank are parties in interest under 29 U.S.C. §§ 1002(14).

120. As described throughout the Complaint, Defendants caused the Plan to utilize high-cost investments that were managed by DIMA and generated revenue for DIMA and other American subsidiaries and affiliates of Deutsche Bank who provide services to the Deutsche Bank mutual funds. On a monthly basis throughout the relevant period, DIMA deducted fees and expenses from the assets being held for the Plan. These fees and expenses were paid in exchange for the investment management services provided to the Plan by DIMA, and for other services provided by other American subsidiaries of Deutsche Bank, including DeAWM Service Company, DST Systems, Inc., and DeAWM Distributors, Inc. As noted above (in Paragraphs 78, 85, and elsewhere), DIMA's provision of investment management services was on a basis that was less favorable to Plan participants than DIMA's dealings with other shareholders. Accordingly, these transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1).

121. As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management fees in connection with

transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

122.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by DIMA and other American subsidiaries and affiliates of Deutsche Bank in connection with the management of Plan asserts or other services performed for the Plan for more than reasonable compensation.

**COUNT III**
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)**

123.    As described throughout the Complaint, DIMA is a fiduciary of the Plan as that term is used in 29 U.S.C. §§ 1002(21) and 1106(b).

124.    DIMA dealt with the assets of the Plan in its own interest and for its own account when it caused the Plan to pay investment management fees and expenses to DIMA out of Plan assets, in violation of 29 U.S.C. § 1106(b)(1).

125.    DIMA received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan. These transactions took place on a monthly basis when fees and expenses were deducted from assets being held for Plan participants in exchange for the investment management services performed by DIMA. These payments to DIMA constitute prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

126.    Based on the foregoing facts and the other facts set forth in this Complaint, the Benefits Committee and O'Connell knowingly caused the Plan to engage in prohibited transactions with DIMA, a fiduciary of the Plan, by selecting Deutsche Bank mutual funds as

core Plan investment options, and are therefore liable for the prohibited transactions as co-fiduciaries.

127.    Based on the foregoing facts and other facts set forth in the Complaint, the Executive Committee and DBAHC are liable for violations of 29 U.S.C. § 1106(b) because they knowingly participated in these prohibited transactions, and made no efforts to prevent these transactions despite having knowledge that the prohibited transactions were taking place.

128.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

129.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by DIMA resulting directly or indirectly from the above-mentioned prohibited transactions.

## COUNT IV
### Failure to Monitor Fiduciaries

130.    As alleged throughout the Complaint, DBAHC and the Executive Committee are fiduciaries of the Plan.

131.    DBAHC had overall oversight responsibility for the Plan, and the explicit responsibility for appointing and removing members of the Executive Committee, and the authority for hiring and terminating employees who were ultimately appointed as members of the Benefits Committee.   DBAHC therefore had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Executive Committee and the Benefits Committee.

132.   The Executive Committee was responsible for directly overseeing the actions of the Benefits Committee, and for appointing and removing members of the Benefits Committee. The Executive Committee and its individual members had a fiduciary responsibility to monitor the other fiduciaries, including the Benefits Committee and its individual members.

133.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations.

134.   To the extent that DBAHC's or the Executive Committee's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

135.   DBAHC, the Executive Committee, and the individual members of the Executive Committee breached their fiduciary monitoring duties by, among other things:

a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

b)   failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in clear violation of ERISA;

c)   failing to monitor the transactions of the Plan to ensure that the Plan was not entering into any prohibited transactions and that no assets of the Plan were inuring to the benefit of a Plan employer; and

d)  failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

**COUNT V**
**Equitable Restitution of Ill-Gotten Proceeds**
**29 U.S.C. §§ 1103(c)(1) & 1132(a)(3)**

136.    DBAHC, DIMA, and other American subsidiaries and affiliates of Deutsche Bank are employers of participants of the Plan as defined by 29 U.S.C. § 1002(5).

137.    29 U.S.C. § 1103(c)(1) provides that the assets of an employee benefit plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries."

138.    The purpose of the anti-inurement provision "is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004). *See also Gray v. Phoenix Bond & Indem. Co.*, 2014 WL 1673740, at *3 (N.D. Ill. Apr. 27, 2014) (concluding that "ERISA's anti-inurement or exclusive benefit provision is meant to preclude self-dealing among plan fiduciaries"); *Winpisinger v. Aurora Corp. of Ill., Precision Castings Division*, 456 F. Supp. 559, 565–66 (N.D. Ohio Feb. 21, 1978) (interpreting the anti-inurement provision as "forever forbidding employer self-dealing in the [ERISA plan]'s assets").

139.    Due to Defendants' self-dealing and imprudent investments, Plan assets inured to the benefit of Plan employers as a result of the Plan's investments in Deutsche Bank mutual

funds and the subsequent assessment of investment management expenses against the accounts of Plan participants on a monthly basis.

140.     Pursuant to 29 U.S.C. § 1132(a)(2), Defendants are required to make good losses to the Plan caused by their actions which permitted the inurement of Plan assets to a Plan employer.

141.     Pursuant to 29 U.S.C. § 1132(a)(3), DIMA and DBAHC should be required to disgorge all Plan assets that have inured to them as a result of their self-dealing.  These assets should be restored to the Plan under principles of equitable restitution.  Plaintiffs also seek any other equitable relief the Court deems appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets from imprudent investments to prudent alternative investments; removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions; and imposition of a constructive trust as necessary for administration of some or all of the aforementioned remedies.

142.     Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA.  Defendants knew or should have known that the conduct described above violated ERISA, was inconsistent with their their fiduciary duties, and resulted in prohibited transactions.

143.     To the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to restore these monies to the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Moreno and O'Halloran, individually and as representatives of the Class defined herein, and on behalf of the Deutsche Bank Matched Savings Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendants have breached their fiduciary duties under ERISA;

D.     A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

E.     A declaration that Plan assets inured to the benefit of Plan employers in violation of 29 U.S.C. § 1103;

F.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

G.     An order requiring Defendants to disgorge all profits received from, or in respect of, the Plan;

H.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including disgorgement of profits earned by Defendants as a result of Defendants' breaches of fiduciary duties;

I.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

K.      An award of pre-judgment interest;

L.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

M.      An award of such other and further relief as the Court deems equitable and just.


Dated: December 21, 2015                    **NICHOLS KASTER, PLLP**

                                            /s/ Michele R. Fisher
                                            Michele R. Fisher, NY Bar Code # MF4600
                                            Kai H. Richter, MN Bar No. 0296545*
                                            Carl F. Engstrom, MN Bar No. 0396298*
                                            John G. Albanese, MN Bar No. 0395882*
                                            *pro hac vice* (applications forthcoming)
                                            4600 IDS Center
                                            80 S 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: 612-256-3200
                                            Facsimile: 612-338-4878
                                            fisher@nka.com
                                            krichter@nka.com
                                            cengstrom@nka.com
                                            jalbanese@nka.com

                                            ATTORNEYS FOR PLAINTIFFS