## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RAMON MORENO and DONALD
O'HALLORAN, individually and as
representatives of a class of similarly situated
persons, and on behalf of the Deutsche Bank
Matched Savings Plan,

                       *Plaintiffs*,

        v.

DEUTSCHE BANK AMERICAS HOLDING
CORP., DEUTSCHE BANK MATCHED
SAVINGS PLAN INVESTMENT
COMMITTEE, DEUTSCHE BANK AMERICAS
HOLDING CORP. EXECUTIVE COMMITTEE,
RICHARD O'CONNELL, DEUTSCHE BANK
AG, DEUTSCHE BANK INVESTMENT
MANAGEMENT AMERICAS INC., DeAWM
SERVICE COMPANY, RREEF AMERICA,
LLC, and JOHN DOES 1-40,

                     *Defendants*.

    Case No. 1:15-CV-09936 (LGS)

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT

James O. Fleckner, *admitted pro hac vice*
Alison V. Douglass, *admitted pro hac vice*
Jaime A. Santos, *admitted pro hac vice*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Richard M. Strassberg
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Dated: April 29, 2016

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.      The Deutsche Bank Matched Savings Plan ...................................................3

II.     Plaintiffs' Allegations ....................................................................................5

ARGUMENT ........................................................................................................................6

I.      Plaintiffs' Claims Are Barred by ERISA's Statute of Limitations. ...................7

    A.   Plaintiffs' Claims are Barred by ERISA's Three-Year Statute of
        Limitations. ..........................................................................................7

    B.   ERISA's Six Year Statute of Repose Also Bars Plaintiffs' Prohibited
        Transaction Claims (Counts II, III)......................................................9

    C.   Plaintiffs Fail to Adequately Plead Fraud or Concealment. ................10

II.     Plaintiffs Fail to State a Claim. ...................................................................12

    A.   Standards Governing Dismissal Under Rule 12(b)(6) .........................12

    B.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count I)...............13

        1.   The Plan's Use of Proprietary Funds .....................................14

        2.   Existence of Alternative Investment Options with Cheaper Fees ...........16

        3.   Purportedly Under-Performing Proprietary Funds ...................19

        4.   Failure to Move to Lower-Cost Share Classes of Existing Mutual
            Fund Investments .................................................................22

        5.   Failure to Investigate Separate Accounts or Collective Trusts.................23

    C.   Plaintiffs Fail to State Any Prohibited Transaction Claim (Counts II, III)...........24

    D.   Plaintiffs Fail to State a Claim for Equitable Restitution (Count V). ...................26

III.    Counts I, II, and III Against DIMA and RREEF Fail for Lack of Fiduciary Status..........28

CONCLUSION....................................................................................................................30

85637659

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006)....................................................................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................16, 21

*Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*,
  No. 11-CV-873-JPS, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011)......................17

*Augienello v. Coast-to-Coast Fin. Corp.*,
  No. 01 CIV. 11608 (RWS), 2002 WL 1822926 (S.D.N.Y. Aug. 7, 2002)............27

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  756 F. Supp. 2d 330 (S.D.N.Y. 2010)......................................................................3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................12, 14

*Bell v. Reno*,
  218 F.3d 86 (2d Cir. 2000)......................................................................................26

*In re Bristol–Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................19

*Caputo v. Pfizer, Inc.*,
  267 F.3d 181 (2d Cir. 2001)........................................................................7, 10, 11

*Chilko v. Lorren*,
  No. 07-cv-1316, 2008 WL 3154734 (E.D. Cal. Aug. 3, 2008)..............................27

*In re Citigroup ERISA Litig.*,
  104 F. Supp. 3d 599, 611 (S.D.N.Y 2015)................................................................7

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011)..............................................................................20, 26

*Conkright v. Frommert*,
  559 U.S. 506 (2010).................................................................................................13

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ...................................................................................9

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) .................................................................................9

85637659

*Dupree v. The Prudential Ins. Co. of Am.*,
   No. 99-8837, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ....................................................15

*Eternity Global Master Fund v. Morgan Guar. Trust Co.*,
   375 F.3d 168 (2d Cir. 2004)....................................................................................................10

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014)............................................................................................................13

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
   694 F.2d 923 (2d Cir.1982).....................................................................................................18

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)..........................................................................................................26, 27

*Griffin v. McNiff*,
   744 F. Supp. 1237 (S.D.N.Y.1990).........................................................................................10

*Harris Trust & Sav. Bank v. Salomon Smith Barney*,
   530 U.S. 238 (2000)................................................................................................................28

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .............................................................................16, 17, 19, 24, 25

*IATSE Local 33 Section 401(k) Plan Bd. of Trs. v. Bullock*,
   No. 08-3949, 2008 WL 4838490 (C.D. Cal. Nov. 5, 2008) ....................................................30

*Indep. Investor Protective League v. SEC*,
   495 F.2d 311 (2d Cir. 1974)......................................................................................................6

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990)........................................................................................17

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
   No. CIV. 11-1083 RMB/KMW, 2012 WL 6568409 (D.N.J. Dec. 17, 2012)..........................17

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989).....................................................................................................18

*Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*,
   95 F. Supp. 3d 402 (S.D.N.Y. 2015)..........................................................................................3

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,
   513 F. App'x 78 (2d Cir. 2013) ..........................................................................2, 16, 20, 21

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   129 F. Supp. 3d 4 (S.D.N.Y. 2015)...................................................................................13, 21

*Leber v. Citigroup, Inc.*,
  No. 07 Civ. 9329(SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ................................25

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)...........................................................................6

*Leimkuehler v. Am. United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) .......................................................................................22

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ..................................................................................23, 24

*Mehling v. N.Y. Life Ins. Co.*,
  163 F. Supp. 2d 502 (E.D. Pa. 2001) ............................................................................25

*Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*,
  136 S. Ct. 651 (2016)................................................................................................27

*Nechis v. Oxford Health Plans, Inc.*,
  328 F. Supp. 2d 469 (S.D.N.Y. 2004)...........................................................................27

*Nechis v. Oxford Health Plans, Inc.*,
  421 F.3d 96 (2d Cir. 2005).........................................................................................12

*O'Brien v. Nat'l Prop. Analysts Partners*,
  719 F. Supp. 222 (S.D.N.Y.1989)................................................................................10

*Okyere v. Palisades Collection, LLC*,
  961 F. Supp. 2d 522 (S.D.N.Y. 2013)...........................................................................12

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)............................................... 1, 2, 12-14, 16, 20, 21, 23, 24, 29

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011).................................................................................17, 24

*Skin Pathology Assocs., Inc. v. Morgan Stanley & Co.*,
  27 F. Supp. 3d 371, 374-78 (S.D.N.Y. 2014) .................................................................25

*Slaymon v. SLM Corp.*,
  506 F. App'x 61 (2d Cir. 2012) ...................................................................................12

*Solis v. Webb*,
  931 F. Supp. 2d 936 (N.D. Cal. 2012) ............................................................................9

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015).................................................................................................9

iv

*Turner v. Davis Select Advisers LP*,
4:08-cv-00421-AWT, slip op. (D. Ariz. June 1, 2011)...........................................17

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................12

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) ..........................................................................9

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) ................................................................2, 17, 18

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
550 F. Supp. 2d 416 (S.D.N.Y. 2008)...............................................................7, 8

**Statutes and Regulations**

Employee Retirement Income Security Act of 1974,
29 U.S.C. § 1001 *et seq*..................................................................................1

29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)), .............................................29, 30

29 U.S.C. § 1022(a) (ERISA § 102(a))................................................................8

29 U.S.C. § 1101(b)(1) (ERISA § 401(b)(1)) .....................................................29

29 U.S.C. § 1104(a) (ERISA § 404(a))..........................................5, 9, 13, 14, 26, 30

29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1)) ....................................................29

29 U.S.C. § 1104(c) (ERISA § 404(c)).............................................................11

29 U.S.C. § 1106 (ERISA § 406)................................................9, 24, 26, 29, 30

29 U.S.C. § 1106(a) (ERISA § 406(a)).........................................................6, 29

29 U.S.C. § 1106  (ERISA § 406(b))............................................................6, 29

29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2))....................................................25

29 U.S.C. § 1108(b)(5) (ERISA § 408(b)(5)) ...................................................15

29 U.S.C. § 1108(b)(8) (ERISA § 408(b)(8))................................................15, 24

29 U.S.C. § 1109 (ERISA § 409)................................................................28, 29

29 U.S.C. § 1113(1) (ERISA § 413(1)) .............................................................9

29 U.S.C. § 1113(2) (ERISA § 413(2)............................................................7, 10

v

29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) ...................................................6, 26, 27, 28, 30

Investment Advisers Act of 1940,
  15 U.S.C. § 80b-1 *et seq* .........................................................................................30

Investment Company Act of 1940,
  15 U.S.C. § 80a-1 *et seq* ...............................................................................4, 23, 30

17 C.F.R. § 270.0-1(a)(7)...............................................................................................23

29 C.F.R. § 2510.3-101..................................................................................................30

29 C.F.R § 2550.404a-5 .........................................................................................3, 8, 11

29 C.F.R. § 2550.404a-5(d)(1)(iii)...................................................................................8

42 Fed. Reg. 18,734 (Mar. 31, 1977)......................................................................15, 24

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................10, 11

Fed. R. Civ. P. 12(b)(6)............................................................................................12, 13

**Other Authorities**

Collective Investment Fund, Investopedia, http://www.investopedia.com/terms/c/
  collective-investment-fund.asp (last visited Apr. 28, 2016) .........................................4

Deloitte Development LLC, Annual Defined Contribution Benchmarking
  Survey 29 (2014)...........................................................................................................22

Deutsche Asset & Wealth Management Named Best Asset Manager By Reactions
  Magazine for the Sixth Consecutive Year, BusinessWire (Sept. 26, 2013),
  http://www.businesswire.com/news/home/20130926006114/en/Deutsche-
  Asset-Wealth-Management-Named-Asset-Manager ....................................................3

Deutsche Bank Annual Review 2014 ...............................................................................3

Fidelity BrokerageLink Handbook ...................................................................................5

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5,038.........14, 30

Katrina Lamb, *Separately Managed Accounts: A Mutual Fund Alternative*,
  http://www.investopedia.com/articles/mutualfund/08/managed-separate-account.asp.............4

Mutual Fund, Investopedia, http://www.investopedia.com/terms/m/mutual
  fund.asp (last visited Apr. 28, 2016)..............................................................................4

85637659

U.S. Dep't of Labor, A Look at 401(k) Plan Fees 9 (2013) ....................................................17, 22

U.S. Dep't of Labor Advisory Op. 2013-03A ..............................................................................22

U.S. Dep't of Labor, Delivery of a Summary Prospectus in an ERISA § 404(c)
   plan, Field Assistance Bulletin No. 2009-3 (Sept. 8, 2009) ....................................................11

85637659

## INTRODUCTION

Plaintiffs are two former participants in the Deutsche Bank Matched Savings Plan ("Plan"), a 401(k) plan that offers a wide array of high-quality, low-cost funds in which Plan participants may invest.  Plaintiffs claim that various Deutsche Bank individuals and entities ("Defendants") breached their fiduciary duties of prudence and loyalty and engaged in prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), by offering, among the Plan's diverse and low-cost menu of investments, mutual funds that were more expensive than other available investments and, in some instances, underperformed benchmarks.  But Plaintiffs plead no facts—as opposed to conclusions—demonstrating that the Plan fiduciaries' process was deficient in any way or marred by an improper motive.

Lacking such facts, Plaintiffs seek to have the Court infer a deficient process by pleading inapt comparisons between the Plan's investments and alternative options, allegations of poor performance that are contradicted by Plaintiffs' own sources, and attributes of the Plan's investment options—such as the inclusion of proprietary funds (*i.e.*, advised or sub-advised by one or more of the Defendants) and the offering of mutual funds rather than separate accounts— that are both common in 401(k) plans and expressly permitted by the statute, regulations, Department of Labor ("DOL") exemptions, and caselaw.  These characteristics permit no inference of misconduct, and they surely do not demonstrate, as Plaintiffs must to defeat a motion to dismiss, "more than a sheer possibility that a defendant has acted unlawfully." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013).  Indeed, on at least three occasions, the Second Circuit has affirmed dismissal of similar ERISA claims where plaintiffs did not plead that investment selections for an employee

1

benefit plan were the result of a deficient fiduciary process.  *See PBGC*, 712 F.3d at 718; *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 (2d Cir. 2013); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009).  And Plaintiffs' claims are even *less* plausible than the claims that other courts have previously dismissed, because the number of proprietary funds offered under the Plan has actually *decreased* during the putative class period.

In addition to these defects, the First Amended Complaint ("Complaint" or "FAC") should be dismissed for four additional reasons.  First, Plaintiffs' claims are time-barred.  Plaintiffs had knowledge more than three years ago of the salient facts upon which they rely from documents that were disclosed to them and were publicly available, and thus ERISA's statute of limitations bars all of their claims.  ERISA's statute of repose also bars Plaintiffs' prohibited transaction claims because the relevant "transactions"—the Plan's offering of the proprietary funds that Plaintiffs challenge—occurred more than six years ago.  Second, Plaintiffs fail to plead any transaction prohibited by ERISA because it is clear from the face of the FAC that ERISA and its regulations exempt from ERISA's prohibited transaction rules the very conduct that Plaintiffs' challenge—investment in proprietary mutual funds.  Third, Plaintiffs fail to state a claim for equitable restitution because Plaintiffs seek money damages and not a form of relief that is available in equity.  And fourth, Plaintiffs' claims against DIMA and RREEF fail because Plaintiffs do not and cannot adequately allege that these two Defendants are Plan fiduciaries given that DIMA and RREEF are not investment advisers to the Plan, they are investment advisers to mutual funds offered under the Plan.  Accordingly, the Complaint must be dismissed in its entirety.

2

# BACKGROUND[1]

## I.     The Deutsche Bank Matched Savings Plan

Defendants Deutsche Bank Americas Holding Corp. ("DBAHC"), Deutsche Investment

Management Americas Inc. ("DIMA"), DeAWM Service Company ("DSC"), and RREEF

America, LLC ("RREEF") are affiliates of Deutsche Bank AG ("DB AG"), a leading global

financial services firm.[2]  Deutsche Bank's Asset & Wealth Management ("DeAWM") division

had more than $1 trillion in assets under management as of December 31, 2014.[3]

The Plan is among the benefits offered to eligible U.S. employees of Deutsche Bank and

certain affiliates, including DBAHC and DIMA.  FAC ¶ 19.  The Plan is designed to provide

eligible employees with the "opportunity to accumulate assets for their retirement."[4]  The Plan

has almost $3 billion in assets and approximately 20,000 participants.[5]

Participating employees can elect to contribute anywhere from 1% to 40% of their salary

to their Plan account.[6]  And although they are not required to do so under ERISA or DOL

regulations, Plan employers—including the corporate Defendants—make matching contributions

to eligible employees' accounts of up to 5% of each eligible employee's total compensation,[7] and

fixed contributions to certain eligible employees' accounts of up to 6% of the first $100,000 of

---

[1] Relevant Plan documents, public filings, and fee disclosures that were provided to Plaintiffs as required by 29 C.F.R § 2550.404a-5 are provided for this Court's reference as exhibits to the Declaration of Jaime A. Santos in Support of Defendants' Motion to Dismiss ("Santos Decl."), submitted herewith.  Courts routinely consider these documents when resolving motions to dismiss, because they are either legally required disclosures, or are documents possessed by or known to Plaintiffs and upon which Plaintiffs relied in bringing this action, *see, e.g.*, Compl. ¶ 23 (discussing the Plan's Forms 5500); *id.* ¶¶ 65 (discussing quarterly fee disclosures).  *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 756 F. Supp. 2d 330, 344-45 (S.D.N.Y. 2010);  *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 95 F. Supp. 3d 402, 408 (S.D.N.Y. 2015).
[2] *See, e.g.*, Deutsche Asset & Wealth Management Named Best Asset Manager By Reactions Magazine for the Sixth Consecutive Year, BusinessWire, http://www.businesswire.com/news/home/20130926006114/en/Deutsche-Asset-Wealth-Management-Named-Asset-Manager (Sept. 26, 2013).
[3] *See* Deutsche Bank Annual Review 2014, *available at* https://www.db.com/ir/en/download/Deutsche_Bank_Annual_Report_2014_entire.pdf.
[4] 2012 Amended and Restated Deutsche Bank Matched Savings Plan ("Plan Document") § 1.2, Santos Decl. Ex. A.
[5] 2014 Form 5500, at DB0000931, DB0001058, Santos Decl. Ex. B.
[6] Plan Document §§ 4.1-4.2, Santos Decl. Ex. A; 2009 Summary Plan Description ("SPD"), at DB0000376, Santos Decl. Ex. H.
[7] Plan Document § 5.2, Santos Decl. Ex. A .

eligible compensation per year.[8]  In total, participating employers contributed approximately

$361 million to the Plan between 2009 and 2014—averaging more than $60 million per year.[9]

The Plan is entirely participant-directed, meaning that each participant can allocate the

amounts credited to her Plan account to any investment option that has been made available

under the Plan.  As set forth in the Plan's most recent financial disclosure to the DOL (on Form

5500), the Plan's core options as of the end of 2014 consisted of a broad array of sixteen mutual

funds, twelve collective trusts, and one separate account.[10]  Of those 29 investment options, 23

were sponsored by entities unrelated to Deutsche Bank, and only six (*i.e.*, 20.7%) were

"proprietary" funds.[11]  Indeed, the number of proprietary mutual funds on the menu has

decreased during the putative class period, from ten proprietary mutual funds out of 22

investment options as of December 2009 to six proprietary funds out of 29 investment options

today.[12]  The investments available to Plan participants represent a wide range of asset

categories, including domestic and international funds, actively-managed and passive funds, and

funds that offer different levels of risk and potential reward.  As a consequence of the diversity

of these offerings, the fees charged by the Plan's investment options vary as well, with expense

---

[8] *Id.* § 5.5.

[9] *See* 2014 Form 5500, at DB0001058, Santos Decl. Ex. B; 2013 Form 5500, at DB0000902, Santos Decl. Ex. C; 2012 Form 5500, at DB0000837, Santos Decl. Ex. D; 2011 Form 5500, at DB0000778, Santos Decl. Ex. E; 2010 Form 5500, at DB0000717, Santos Decl. Ex. F; 2009 Form 5500, at DB0000656, Santos Decl. Ex. G.

[10] 2014 Form 5500, at DB0001086, Santos Decl. Ex. B.  Mutual funds, collective trusts, and  separately managed accounts are different forms of investment vehicles.  Unlike a mutual fund, which is heavily regulated under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq*, a collective trust "is a fund operated by a trust company or a bank and handles a pooled group of trust accounts,"  and a separately managed account is a "portfolio of assets under the management of a professional investment firm" for a single investor.  Mutual Fund, Investopedia, http://www.investopedia.com/terms/m/mutualfund.asp (last visited Apr. 28, 2016); Collective Investment Fund, Investopedia, http://www.investopedia.com/terms/c/collective-investment-fund.asp (last visited Apr. 28, 2016); Katrina Lamb, *Separately Managed Accounts: A Mutual Fund Alternative*, Investopedia http://www.investopedia.com/articles/mutualfund/08/managed-separate-account.asp (last visited Apr. 28, 2016).

[11] 2014 Form 5500, at DB0001086, Santos Decl. Ex. B.  Approximately forty different mutual funds, collective trusts, and separate accounts have been offered during the putative class period (since December 21, 2009), of which ten were proprietary mutual funds.  *See* Santos Decl. Ex. O.  For ease of reference, a chart listing the investment options offered by the Plan from 2008 through 2014, based on the Plan's Form 5500s during this time period, is provided for this Court as Exhibit O to the Santos Declaration.  *See* Santos Decl. ¶ 16.

[12] *See* FAC ¶ 73; Santos Decl. Ex. O.

ratios ranging from less than 0.10% to as much as 1.18%.[13]  Further, Plan participants can also choose to invest in thousands of funds made available through a self-directed mutual fund window—Fidelity's BrokerageLink.[14]

Not surprisingly, the Plan is very popular with employees.  From 2009 through 2014, employees contributed over $625 million of their salaries to the Plan and rolled over more than $55 million *into* the Plan from plans offered by prior employers.[15]  Further, although participants who leave the employ of participating employers are allowed to withdraw their Plan account balances and roll them over to another plan or individual retirement account on a tax-free basis, many have decided to leave their assets in the Plan.  Indeed, former employees constituted almost one-half of the total number of Plan participants as of the end of 2014.[16]

## II.     Plaintiffs' Allegations

Plaintiffs are two former Plan participants who purport to bring five claims on behalf of "[a]ll participants and beneficiaries of the [] Plan at any time on or after December 21, 2009." FAC ¶ 121.  Count I alleges that Defendants breached their fiduciary duties of prudence and loyalty under ERISA § 404(a), 29 U.S.C. § 1104(a), by failing to monitor the Plans' investment options and failing to remove investments that had become imprudent.  FAC ¶¶ 129-136. Plaintiffs identify four attributes of the Plan that "illustrate" this alleged breach (*id.* ¶ 133): (i) the Plan retained proprietary index funds whose expense ratios were higher than index funds offered by other companies; (ii) the Plan retained proprietary actively-managed funds with expense ratios that exceeded other actively-managed funds on the market and that

---

[13] *See* 404a-5 Participant Fee Disclosure, at DB0001092-DB0001096 (Jan. 12, 2016), Santos Decl. Ex. I.
[14] SPD, at DB0000382, Santos Decl. Ex. H; *see also* Fidelity BrokerageLink Handbook, *available at* https://www.mysavingsatwork.com/taxexempt/assets/370190_FidelityBrokerageLink.pdf.
[15] *See* 2014 Form 5500, at DB0001058, Santos Decl. Ex. B; 2013 Form 5500, at DB0000902, Santos Decl. Ex. C; 2012 Form 5500, at DB0000837, Santos Decl. Ex. D; 2011 Form 5500, at DB0000778, Santos Decl. Ex. E; 2010 Form 5500, at DB0000717, Santos Decl. Ex. F; 2009 Form 5500, at DB0000656, Santos Decl. Ex. G.
[16] 2014 Form 5500, at DB0000931, Santos Decl. Ex. B.

underperformed their benchmark indices; (iii) when a cheaper share class became available in six of the funds offered by the Plan, Defendants did not shift to the newly-available share class, and (iv) the Plan failed to utilize separate accounts or collective trusts for its actively-managed investments—vehicles that, Plaintiffs allege, carry a lower expense ratio than mutual funds. FAC ¶ 129.  Plaintiffs admit that they have no knowledge of the process by which the Plan's investment options are chosen and managed, FAC ¶ 119, but they contend that the above attributes demonstrate that the investment process followed by the Plan must have been deficient.

Counts II and III of the Complaint allege that, by offering proprietary funds, Defendants caused the Plan to engage in transactions with DIMA, RREEF, DSC, and DB AG that were prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a) (Count II), and that Defendants DBAHC, DIMA, and RREEF are Plan fiduciaries who engaged in self-dealing prohibited by ERISA § 406(b), 29 U.S.C. § 1106(b), by receiving fees and expenses in connection with services provided to certain Plan funds (Count III).  Compl. ¶¶ 137-49.  Count IV alleges that DBAHC, the Executive Committee, and Mr. O'Connell failed to adequately monitor the fiduciaries responsible for selecting and managing Plan investment options.  *Id.* ¶¶ 150-58.  Count V seeks equitable restitution from DB AG, DSC, DBAHC, DIMA, and RREEF under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), in their capacity as employers, for any payments they received from proprietary funds offered as core investment options.  FAC ¶¶ 159-66.

## ARGUMENT

Plaintiffs' claims fail because (i) they are barred by the statute of limitations; (ii) each Count fails to state a claim; and (iii) certain Defendants are improper parties to the suit.[17]

---

[17] Plaintiffs also lack standing to assert any claims with respect to funds in which they did not themselves invest during the relevant time*.  See, e.g., Indep. Investor Protective League v. SEC*, 495 F.2d 311, 312-13 (2d Cir. 1974); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010), *aff'd*, 650 F.3d 167 (2d Cir. 2011).  Defendants reserve their right to challenge Plaintiffs' lack of standing as to particular funds.

85637659

I.      **Plaintiffs' Claims Are Barred by ERISA's Statute of Limitations.**

    A.      **Plaintiffs' Claims are Barred by ERISA's Three-Year Statute of Limitations.**

ERISA § 413(2) precludes claims that are filed more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).  A plaintiff need not have knowledge of every relevant fact before § 413(2) is triggered; instead, a plaintiff has actual knowledge when he has "knowledge of all facts necessary to constitute a claim."  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001).  In determining "actual knowledge," the proper focus is "whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents."  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008) (dismissing claims), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir. 2009).  Indeed, "Congress did not intend the 'actual knowledge requirement to excuse willful blindness by a plaintiff.'"  *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 611 (citation omitted) (S.D.N.Y 2015), *appeal docketed*, No. 15-2461 (2d Cir.).  On this basis, this court recently held that ERISA breach of fiduciary duty claims were barred at the pleading stage by ERISA's three-year limitations period where the claims were based not on allegations regarding the Plan's decision-making process, but on information that was publicly available more than three years prior to the filing of the complaint.  104 F. Supp. 3d at 610-11.

Here, the public record and Plaintiffs' own allegations demonstrate that Plaintiffs had knowledge of the salient facts upon which they rely for more than three years before they filed suit.  Like the plaintiffs in *Citigroup*, Plaintiffs do not rely on allegations regarding the Plan's investment decision-making process.  Instead, they rely on the ***characteristics*** of the Plan's investment options—the inclusion of proprietary funds; the use of mutual funds in addition to separate accounts and collective trusts; and the purportedly high fees, and in some cases

allegedly poor performance, of some of the investment options offered.  But the availability of these investment options, and their fees and performance, has always been disclosed to Plan participants and, in the case of mutual funds, available to the public at large.[18]  Indeed, as required by regulation, 29 C.F.R. § 2550.404a-5(d)(1)(iii), the participant fee disclosures and the individual account statements that participants receive not only report each investment option's performance (for the prior one-year, five-year, and ten-year periods), but also the performance for each fund's **benchmark**—the exact information upon which Plaintiffs rely for their allegations of purported underperformance.  FAC. ¶¶ 93, 94.[19]  Further, the challenged investments have been disclosed for many years in public filings, including the Plan's Form 5500, which Plaintiffs cite in their Complaint.  FAC ¶ 24.

In this regard, the allegations in this case are nearly indistinguishable from claims this court dismissed in *Young*.  Like Plaintiffs here, the plaintiffs in *Young* alleged, as the "central basis" of one of their claims, that the plans at issue offered investments in mutual funds with "fees in excess of similar investment products available" to them.  550 F. Supp. 2d at 419, 420.  The Court dismissed the claim as time-barred because it was "undisputed that Plaintiffs had actual knowledge that the Plans offered the [] Funds as investment options and the quarterly performance summaries provided to Plan participants clearly disclosed the fees and expenses associated with the [] Funds, including the fact that the expense ratios for some of the [] Funds were higher than those for alternative investment options."  *Id.* at 420.

Plaintiffs here do not, and cannot, allege that they were unaware of the fees and

---

[18] The Plan's administrator is required by statute and regulation to provide specific disclosures to Plan participants, in the Summary Plan Descriptions and quarterly fee disclosures required by ERISA § 102(a), 29 U.S.C. § 1022(a) (requirement of delivery of Summary Plan Description), 29 C.F.R § 2550.404a-5 (requirement of quarterly fee disclosure).  *See, e.g.*, 2009 SPD, at DB0000382-83, Santos Decl. Ex. H; 404a-5 Participant Fee Disclosure, at DB0001104-DB0001109 (Apr. 30, 2012), Santos Decl. Ex. J.

[19] The Summary Plan Description also instructs plan participants that they can request, free of charge, information regarding each core investment option, including "past and current investment performance."  *See* 2009 SPD, at DB0000383, Santos Decl. Ex. H.

8

performance of their Plan investments more than three years ago.  Accordingly, as in *Young*, Plaintiffs' claims with respect to fully-disclosed fees and attributes of the funds are barred by ERISA's three-year limitations period.

> **B.     ERISA's Six Year Statute of Repose Also Bars Plaintiffs' Prohibited Transaction Claims (Counts II, III).**

In addition, Counts II and III, alleging prohibited transactions under ERISA § 406 based on the use of proprietary funds, are also barred by ERISA's statute of repose, which precludes claims filed more than "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violations."  ERISA § 413(1), 29 U.S.C. § 1113(1).  Every proprietary fund offered as an investment option under the Plan was added well over six years ago; no new proprietary fund has been added within the repose period.  *See* Santos Decl. Ex. O.

Claims under § 406 require a "transaction."  A decision to continue holding certain investments does not constitute a "transaction" for purposes of the prohibited transaction rules.[20] *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("The decision by [defendants] to ***continue*** to hold 15% of Plan assets in employer stock was not a 'transaction.'") (emphasis in original).  Instead, the only action that can support an alleged prohibited transaction is "the initial selection of the [relevant] funds."  *David v. Alphin*, 704 F.3d 327, 341 (4th Cir. 2013).  Here, all of the challenged proprietary funds that Plaintiffs held were

---

[20] The Supreme Court's decision in *Tibble v. Edison International*, 135 S. Ct. 1823 (2015) is not applicable to § 406 prohibited transaction claims.  *Tibble* involved prudence claims under ERISA § 404(a) and was premised on § 404(a)'s derivation from trust law.  *Id.* at 1828.  In contrast to ERISA's prudence requirement, the prohibited transaction rules and exceptions are not found in the traditional common law of trusts and, as numerous courts have recognized, in fact depart from trust law.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1465-67 (5th Cir. 1983) ("[W]e must bear in mind that in ERISA Congress departed from the absolute common law rule against fiduciaries' dual loyalties."); *Solis v. Webb*, 931 F. Supp. 2d 936, 947 (N.D. Cal. 2012) (prohibited transactions rules reflect "Congress's effort to tailor traditional judge-made trust law to fit the activities of fiduciaries functioning in the special context of employee benefit plans" (quoting *Donovan*)); *see also Donovan*, 716 F.2d at 1464 n.15 (listing other "modifications of existing trust law" contained in ERISA).

added to the Plan's line-up more than six years prior to their filing suit.  Therefore, their

prohibited transaction claims are time-barred.  *See id.*

C.     **Plaintiffs Fail to Adequately Plead Fraud or Concealment.**

Plaintiffs implicitly acknowledge that they assert stale claims of imprudence by alleging

that the limitations period for their claims should be tolled because "Defendants attempted to

conceal their imprudence from Plan participants."  FAC ¶¶ 80, 119.[21]  But Plaintiffs fail to

adequately plead facts giving rise to tolling.

ERISA's tolling provision applies "in the case of fraud or concealment."  ERISA

§ 413(2), 29 U.S.C. § 1113(2).  The Second Circuit has squarely held that allegations of fraud or

concealment under ERISA's tolling provision are subject to Fed. R. Civ. P. 9(b), requiring

Plaintiffs to "specify the time, place, speaker, and content of the alleged misrepresentations."

*See Caputo*, 267 F.3d at 191.  Plaintiffs also must plead why the statement was allegedly

fraudulent.  *See Eternity Global Master Fund v. Morgan Guar. Trust Co.*, 375 F.3d 168, 186-87

(2d Cir. 2004).  Furthermore, fraud or concealment must be pled with particularity ***as to each***

***defendant***.  *See Griffin v. McNiff*, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y.1990); *O'Brien v.*

*Nat'l Prop. Analysts Partner*s, 719 F. Supp. 222, 232 (S.D.N.Y.1989).

The FAC falls far short of these requirements.  First, the only paragraphs that attempt to

plead fraud or concealment (¶¶ 80-81, 119) contain no Defendant-specific allegations.  Instead,

they group the Defendants together, alleging that "Fiduciary Defendants fraudulently attempt to

conceal their imprudence," FAC ¶ 80, and "Defendants fraudulently attempted to conceal their

imprudence."  *Id.* ¶ 119.  Second, these paragraphs "specify" nothing.  *Caputo*, 267 F.3d at 191.

Instead, they vaguely refer to quarterly statements, prepared by "the Plan," that included some

---

[21] Plaintiffs do not assert, nor could they, that the fact that the Plan made available proprietary funds was hidden.
Therefore, the prohibited transaction and equitable restitution claims (Counts II, III, and V) are not affected in any
event by Plaintiffs' attempt to allege concealment of "imprudence."  FAC ¶ 80.

information (like fund name changes) but not other information that Plaintiffs would have preferred to see, such as the addition or removal of specific funds as "news" items.  FAC ¶ 80.

Finally, Plaintiffs' basis for tolling fails because, even aside from the failure to comply with Rule 9(b), neither of the two facts that Plaintiffs allege creates a plausible "strong inference" of fraudulent intent.  *Caputo*, 267 F.3d at 191.  That the Plan began providing four-page summary prospectuses instead of full-length annual prospectus updates (FAC ¶ 80) in no way suggests any inference of fraudulent intent, much less a strong one.  Indeed, DOL has expressly endorsed the use of summary prospectuses to satisfy the prospectus delivery obligations under ERISA § 404(c).  *See* DOL, Delivery of a Summary Prospectus in an ERISA § 404(c) plan, Field Assistance Bulletin No. 2009-3 (Sept. 8, 2009), *available at* http://www.dol.gov/ebsa/regs/fab2009-3.html.  Further, Plaintiffs do not point to any information disclosing the alleged imprudence that would have been found in annual prospectus updates that was not included in summary prospectuses.  Moreover, the quarterly disclosures that Plaintiffs discuss in FAC ¶ 66 disclose all of the funds and fees in which the Plan was invested, rendering implausible any suggestion that Plaintiffs did not know this information due to the use of summary prospectuses.  *See, e.g.*, 404a-5 Participant Fee Disclosure, at DB0001106-DB0001109 (Apr. 30, 2012), Santos Decl. Ex. J (reporting, in chart form, every investment option offered by the plan, as well as performance data and total fees for each investment option).[22]

The only other factual allegation purporting to assert concealment—that a 2013 quarterly statement failed to disclose the removal of proprietary funds or the addition of Vanguard funds (FAC ¶ 81)—likewise fails to allege any misrepresentations.  As noted above, the quarterly statements disclose all of the funds available as core investments and the expense ratios for each.

---

[22] Plaintiffs notably do not, nor could they, allege that the disclosures violated the detailed rules prescribed by the DOL in 29 C.F.R. § 2550.404a-5 (requiring disclosure of a broad array of financial and performance data).

85637659

Plaintiffs' intimation that the Plan's disclosure must include a redline from prior statements or disclose every individual plan transaction in quarterly summaries to avoid committing fraud or concealment has no legal basis whatsoever and likewise fails to raise a "strong inference" of fraudulent conduct.  *Cf. Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005) ("Oxford has no duty to disclose to plan participants information additional to that required by ERISA."); *Slaymon v. SLM Corp.*, 506 F. App'x 61, 63 (2d Cir. 2012) (same).

**II.      Plaintiffs Fail to State a Claim.**

Not only are the claims time-barred, but each Count of the FAC also fails to state a claim.

**A.      Standards Governing Dismissal Under Rule 12(b)(6)**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  As the Second Circuit has made clear, "the complaint must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'"  *PBGC*, 712 F.3d at 718.  In assessing the sufficiency of a complaint, "a court's first task is to disregard any conclusory statements."  *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 528 (S.D.N.Y. 2013).  It also need not accept as true "factual allegations that are contradicted by documents properly considered on a motion to dismiss."  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 396 (S.D.N.Y. 2005).  A plaintiff must provide "direct or inferential allegations respecting all the material elements" of her claims.  *Twombly*, 550 U.S. at 562.  Where a complaint relies on circumstantial allegations to meet this standard, the facts alleged must be "suggestive of, rather than merely consistent with, a finding of misconduct.'"  *PBGC*, 712 F.3d at 719 (citation omitted).

The *Iqbal* and *Twombly* pleading standards are suited perfectly to ERISA claims, as the Supreme Court and the Second Circuit have recognized.  In enacting ERISA, "Congress sought to create a system that is [not] so complex that administrative costs, or litigation expenses,

unduly discourage employers from offering [ERISA] plans in the first place." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal quotations and citation omitted).  The Second Circuit has acknowledged the risk that an ERISA "plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *PBGC*, 712 F.3d at 719 (alteration in original) (quotation marks omitted).  Because "ERISA imposes extensive disclosure requirements on plan administrators . . . plan beneficiaries (*i.e.*, prospective plaintiffs) [have] the opportunity to" discover claims. *Id.* at 719-20.  Accordingly, the Rule 12(b)(6) stage is an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).  To help "prevent settlement extortion," courts must be convinced that a plaintiff is not "engaged in a fishing expedition" and therefore must carefully police the requirement that a complaint "allege a *factual* predicate concrete enough to warrant further proceedings." *PBGC*, 712 F.3d at 719 (emphasis in original) (citations omitted).

The Complaint does not survive dismissal under these governing principles.

### B.     Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count I)

The Complaint fails to adequately allege that the fiduciary process was deficient.

A claim for breach of fiduciary duty under ERISA § 404(a), 29 U.S.C. § 1104(a), "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results." *PBGC*, 712 F.3d at 716 (alteration in original) (citation omitted); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 9 (S.D.N.Y. 2015) ("ERISA's duty of prudence is one of conduct and not of performance.").  As a result, to state a claim for violation of § 404(a) with respect to investment decisions, a plaintiff must either plead factual allegations directly referring to a fiduciary's investment decisionmaking process, or it must plead sufficient

13

"*nonconclusory* factual content" to raise "a ***plausible*** inference of misconduct."  *PBGC*, 712 F.3d at 718 (emphases in original).

Plaintiffs concede that they do not allege a single fact concerning the process that Plan fiduciaries employ to select and monitor Plan investments.  Compl. ¶ 101.[23]  Instead, they rely on circumstantial allegations and ask this Court to infer an imprudent process.  In doing so, they advance several theories that courts have rejected:  that the inclusion of proprietary investments within a diverse investment menu is evidence of misconduct, that choosing investment options that are more expensive than available alternatives is a *per se* breach, and that a hindsight evaluation of a fund's performance can indicate an imprudent fund selection process.  This Court should likewise reject these arguments and should dismiss Plaintiffs' § 404(a) claims.

### 1.    The Plan's Use of Proprietary Funds

Although Plaintiffs decry the Plan's inclusion of proprietary funds, the mere selection and retention of proprietary funds—among the wide array of choices that the Plan made available to participants—does not give rise to a plausible inference of an imprudent process.

As Congress recognized in passing ERISA, it is "common practice" for financial services companies to invest their own plans' assets in their own investment funds.  H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5,038, 5,096.  Consequently, ERISA includes two statutory exemptions from its prohibited transaction rules for the use of proprietary investment products in plans sponsored by banks and insurance companies.  *See* ERISA

---

[23] Plaintiffs' allegation that "the specifics of Defendants' decision-making processes" are "solely within the possession of Defendants prior to discovery," Compl. ¶ 101, does not warrant or permit diluting the pleading standard articulated in *PBGC.*  As the Second Circuit noted, given the potential exposure to "probing and costly inquiries and document requests about [an alleged ERISA fiduciary's] methods and knowledge at the relevant times," and the settlement extortion risk that this potential creates, an ERISA plaintiff is responsible for paying the "price of entry" to "unlock the doors of discovery" by alleging facts sufficiently concrete "to warrant further proceedings."  *PBGC*, 712 F.3d at 719.  Indeed, *Twombly* itself concerned circumstances similar to those here—where plaintiffs might not have access to certain information pre-discovery. The *Twombly* plaintiffs did not possess evidence concerning defendants' decision-making process or alleged anti-competitive agreements, and, like here, based their claim on circumstantial facts, yet the Court affirmed dismissal.  *See Twombly*, 550 U.S. at 551.

§ 408(b)(5), (8), 29 U.S.C. § 1108(b)(5), (8).  In 1977, the DOL extended this relief to plans sponsored by mutual fund advisers and their affiliates to enable such plans to invest in their affiliated mutual funds pursuant to Prohibited Transaction Exemption ("PTE") 77-3.  *See* 42 Fed. Reg. 18,734, 18,734-35 (Mar. 31, 1977).  In so doing, the DOL recognized that allowing mutual fund companies to make proprietary funds available under their employee benefit plans is "in the interests of plans and of their participants and beneficiaries" and "protective of the rights of participants and beneficiaries."  *Id.* at 18,735.  Conformity with a commonplace "practice—the very result Congress [and the DOL] intended to approve by enacting the[se] exemptions—does not give rise to an inference of disloyalty."  *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007).[24]

Any inference of wrongdoing is further negated by the fact that the number of proprietary mutual funds included among the Plan's core investment options has always been a minority of the available options and has *decreased* over time, to the point that, today, only six of 29 investment options are proprietary funds.  Indeed, not a single proprietary fund has been added to the Plan in the last six years, Santos Decl. Ex. O, which further refutes Plaintiffs' theory that Defendants are using the Plan to generate profits for Deutsche Bank.  Furthermore, the brokerage window provides access to many more non-proprietary options if participants so choose.  Plaintiffs' claims are additionally implausible in light of the generous contributions that participating employers make to the Plan—approximately $60 million *per year* between 2009 and 2014, amounting to hundreds of millions of dollars during the putative class period, an amount that vastly exceeds the supposed "excess fees" that Plaintiffs allege Deutsche Bank received through the inclusion of proprietary funds in the Plan's line-up.  FAC ¶¶ 5, 8.

---

[24] The inclusion of proprietary funds certainly should not have come as any surprise to Plan participants, given that the Plan expressly contemplates the use of proprietary mutual funds. *See* Plan Document § 11.2.

85637659

Given these facts, the inference that Plaintiffs seek to have the Court draw fails. The Court need not credit theories that defy "common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "As between th[e] 'obvious alternative explanation'" for the selection of proprietary funds—that Plan fiduciaries deemed certain of them to be in the best interests of Plan participants—and the disloyalty and intentional self-dealing that Plaintiffs "ask[ this Court] to infer, [a deficient investment process] is not a plausible conclusion." *Iqbal*, 556 U.S. at 682.

### 2.      Existence of Alternative Investment Options with Cheaper Fees

Plaintiffs repeatedly complain that the investment options offered by the Plan charged higher fees than other investment options available on the market, such as the Vanguard Institutional Index Fund that has been made available under the Plan since 2013, and other Vanguard product offerings. FAC ¶¶ 4, 76-78, 87, 97. But it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions." *See PBGC*, 712 F.3d at 718 (affirming dismissal). Further, that the Plan replaced its index fund with the Vanguard index fund two years before suit was brought, does "not serve as evidence that prior conduct was imprudent." *Laboy*, 2012 WL 3191961, at *3 (dismissing claim).

The challenge based on the fees of the funds available under the Plan fails for other reasons as well. First, the fees of Plan investments are well within the range that appellate courts have held do not support a claim of breach. The Plan's core investment options have expense ratios that range from less than 0.10% up to 1.18%, depending on the specific funds that the participant selects.[25] Courts have affirmed the dismissal of similar claims that defendants breached fiduciary duties by offering mutual funds with comparable expense ratios. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 583-86 (7th Cir. 2009) (affirming dismissal where

---

[25] *See* 404a-5 Participant Fee Disclosure, at DB0001092-DB0001096 (Jan. 12, 2016), Santos Decl. Ex. I.

85637659

expense ratios ranged from .07% to just over 1%); *Renfro v. Unisys Corp.,* 671 F.3d 314, 319 (3d Cir. 2011) (affirming dismissal where expense ratios ranged from 0.10% to 1.21%).

Second, the fact that Vanguard offered cheaper funds, and had done so before Vanguard funds were added to the Plan's line-up, is meaningless.  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund . . . ."  *Hecker*, 556 F.3d at 586.  For this reason, the Second Circuit has rejected analogous claims under the Investment Company Act based on comparisons to Vanguard funds, a fund complex notorious for competing based on low fees.  *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345-46 (2d Cir. 2006) (affirming dismissal of claims comparing fund expense ratios to Vanguard's); *see also Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, No. 11-CV-873-JPS, 2011 WL 5826034, at *8 (E.D. Wis. Nov. 18, 2011) (comparisons to Vanguard "of little value").[26] Nothing in ERISA bars every financial firm except for a single low-cost provider from offering investments to retirement plans.

Third, Plaintiffs' focus on investment fees runs contrary to the DOL's caution that fees should not be considered "in a vacuum" because "[t]hey are only one part of the bigger picture including investment risks and returns and the extent and quality of services provided."[27]  It is also contrary to the Second Circuit's analysis in *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31 (2d Cir. 2009), which affirmed the dismissal of excessive fee claims because the mere allegation of excessive fees without any allegations regarding the services rendered for those fees, or other relevant factors, "d[id] not provide a basis upon which to infer that defendants'

---

[26] *See also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1231 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) (noting "significant differences in structure, peculiar to the Vanguard family of funds, which lessen the value of the comparison"); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. CIV. 11-1083 RMB/KMW, 2012 WL 6568409, at *5 (D.N.J. Dec. 17, 2012) ("To be sure, the Vanguard comparison is extremely limited."); *Turner v. Davis Select Advisers LP*, 4:08-cv-00421-AWT, slip op. at 14-15 (D. Ariz. June 1, 2011) (disregarding comparison with Vanguard, which is "known in the industry for having low fees").
[27] U.S. Dep't of Labor, A Look at 401(k) Plan Fees 9 (2013), *available at* http://www.dol.gov/ebsa/publications/401k_employee.html.

85637659

offering of the [challenged] Funds was a breach of their fiduciary duties." *Id.* at 33.[28]

The same reasoning applies here.  Notably, Plaintiffs have not complained about the services provided by proprietary mutual funds or any of the targeted non-proprietary funds, and they ignore the distinguishing attributes that impact cost.  For example, the FAC includes a chart purportedly demonstrating that "the fees for the proprietary funds in the Plan were more than 11 times more expensive than passive index fund alternatives in the same investment style."  FAC ¶ 87 (emphasis omitted).  But a comparison between actively-managed funds, which have the potential to outperform relevant benchmarks, with passive index fund alternatives, which simply seek to track a pre-determined index, is completely inapposite: passive index funds do not require active investment management and are not expected to outperform their benchmarks, and thus will virtually always cost significantly less.  *See* FAC ¶ 57.  And certainly no provision of ERISA or any DOL regulation precludes the use of actively-managed funds.

Furthermore, Plaintiffs' chart conspicuously includes no allegations about the *performance* of (much less the services provided by) the purported fund alternatives, making any comparison between them even more useless.  Such inapt comparisons of fees, without regard for other distinctions, are why the Second Circuit has "cautioned against" "a general comparison of fees," particularly where there are distinctions between the benefits provided by compared investment options.  *Krinsk*, 875 F.2d at 412.

Finally, the existence of a brokerage window further underscores the implausibility of Plaintiffs' fee claim.  While Plaintiffs complain about the Plan's failure to offer specific

---

[28] The Second Circuit considered the absence of allegations about other factors for assessing excessive fees under the Investment Company Act, including "(a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 928 (2d Cir.1982)).

alternative investment options at lower price points, such as Vanguard's Institutional Index Fund (FAC ¶ 76)—a fund currently offered under the Plan—the brokerage window provided Plan participants with the opportunity to choose from 2,500 different investment options that were not in the Plan's designated lineup.  As the Seventh Circuit noted in *Hecker*, the availability of a self-directed brokerage window makes "[a]ny allegation that these options did not provide the participants with a reasonable opportunity to . . . control the risk of loss from fees . . . implausible."  556 F.3d at 590 (citing *Twombly*).

### 3.    Purportedly Under-Performing Proprietary Funds

Plaintiffs also seek an inference of an imprudent process from Defendants' selection and retention of "poorly performing" actively-managed proprietary funds.  FAC ¶¶ 5, 82-97.  The only "poor" performance that Plaintiffs point to consists of just two funds' (out of forty core investment options made available since 2009) alleged underperformance of benchmark indices: by "nearly five" and eleven percent.  *Id.* ¶¶ 93, 94.  But the documents that Plaintiffs cite in support of these allegations—the funds' annual reports—contradict the allegations.  For example, while Plaintiffs allege that the Deutsche Capital Growth Fund (Institutional Class) underperformed its benchmark index "by over 11 percent" in 2009 and 2010, that fund's 2009 annual report actually shows that it ***outperformed*** its longstanding benchmark (S&P 500 Index), and underperformed its new benchmark index (Russell 1000 Growth Index) by just under six percent.  2009 DWS Capital Growth Fund Annual Report, at DB0001113-DB0001114, Santos Decl. Ex. K.  No matter which benchmark is used, Plaintiffs' allegation is refuted by their own documents and thus should be discarded.  *In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").  *Compare also* FAC ¶ 93 (alleging that according to the fund's 2010 annual report, it "had underperformed its index over the past 1-year, 3-year,

and 5-year periods"), *with* 2010 DWS Capital Growth Fund Annual Report, at DB0001116,

Santos Decl. Ex. L (reporting one-year performance that was just two percent below the

benchmark, and 3-year and 5-year performance that was effectively identical to the benchmark).

Plaintiffs' performance allegations regarding the Deutsche Large Cap Value Fund are

likewise refuted by the fund's annual report. *Compare* FAC ¶ 94 (alleging 5%

underperformance) *with* 2010 DWS Large Cap Value Fund Annual Report, at DB0001118,

Santos Decl. Ex. M (showing 3% underperformance for the 1-year period, and outperformance

on a 3-year, 5-year and 10-year basis). Similarly, the Deutsche Capital Growth Fund that

Plaintiffs challenge as "poorly performing" actually ***outperformed*** its benchmark index in 2015.

2015 Deutsche Capital Growth Fund Annual Report, at DB0001120, Santos Decl. Ex. N.

Consequently, the Court should disregard Plaintiffs' unreliable performance allegations.

But even if Plaintiffs' performance allegations were substantiated, they still would not

state a claim because fiduciary standards "focus on a fiduciary's ***conduct*** in arriving at an

investment decision, ***not on its results***, and ask whether a fiduciary employed the appropriate

methods to investigate and determine the merits of a particular investment." *PBGC*, 712 F.3d at

716 (emphasis added). A fiduciary's decisions must be judged "based upon information

available to the fiduciary at the time of each investment decision and not from the vantage point

of hindsight." *PBGC*, 712 F.3d at 716 (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140

(2d Cir. 2011)). For example, the Second Circuit summarily affirmed Judge Baer's dismissal of

claims of imprudence that had been based, in part, on plaintiffs' allegations that the fund at issue

had the worst performance of all its comparators. *Laboy*, 513 F. App'x at 79-80.

Certainly, allegations of a modest failure to achieve a performance benchmark (which is

all that Plaintiffs' allegations amount to) do not permit a reasonable inference of an imprudent

investment decisionmaking process.  *See Leber*, 129 F. Supp. 3d at 14 ("Plaintiffs' allegations of the Funds' alleged underperformance in average annual returns as compared to certain benchmark indices . . . do not raise a plausible inference that a prudent fiduciary would have found those Funds to be 'so plainly risky' as to render the investments in them imprudent." (citation omitted)).[29]  Not only do the annual statements for the funds at issue here show that performance fluctuates, and a fund that underperforms in one year may outperform in other years, but even at their nadir, the alleged underperformance in certain periods here—of 5 and 11%—was substantially less than the underperformance held not to raise an inference of a deficient process in *Laboy*—of amounts between 6.6 and 21.8%.  2012 WL 3191961, at *2.

Finally, in a last ditch attempt to "nudge" their conclusory allegation of a deficient process "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570), Plaintiffs ask the Court to assume poor performance based on general contentions about the performance of the Deutsche Bank "fund famil[y]."  FAC ¶ 90.  But the Second Circuit has rejected the notion that general "warning signs" about a ***company's*** investment performance permit a plausible inference that fiduciaries "knew, or should have known that the securities ***in the Plan's Portfolio*** were imprudent investments."  *PBGC*, 712 F.3d at 709 (emphasis added).  As in *PBGC*, Plaintiffs' "fail[ure] to connect the alleged 'warning signs' to any specific" investment is a "glaring problem."  *Id.* at 722.[30]

---

[29] *See also PBGC*, 712 F.3d at 718 ("Critically . . ., plaintiffs 'cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price." (citation omitted) (alteration in original)).  In *PBGC*, the court stated that even a "rapid" or "sudden" decline in price does not necessarily give rise to an inference of an imprudent investment process and "does not give rise to a reasonable inference that those investments were imprudent to maintain and therefore should have been sold at the much-reduced price."  *Id.* at 722.  And a modest failure to achieve the benchmark performance (a few percentage points in certain years and not in others) is even less likely to permit this inference.

[30] While Plaintiffs posit that "[a] mutual fund company with consistently low rankings is likely to have an inferior research and management infrastructure in place, making future underperformance highly likely," FAC ¶ 90, this is neither a factual allegation nor supported by any authority.  The portion of the Carhart article that Plaintiffs cite says nothing about mutual fund families and speaks only to performance on a fund-specific basis.

85637659

### 4. Failure to Move to Lower-Cost Share Classes of Existing Mutual Fund Investments

Plaintiffs also allege that the Court can infer a deficient fiduciary process because Defendants did not transfer Plan investments in certain mutual funds into newly-available, lower-cost share classes. FAC ¶¶ 98-107, 133. However, a failure to move to a lower-cost share class does not suggest a breach of any duty to monitor investments, because prudent fund selection is not based on expense ratios alone. As the Seventh Circuit has acknowledged, "some share classes are more expensive than others, but the cheapest option may not inevitably be the best option." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013). A higher expense ratio fund may generate revenue that funds plan administration through revenue sharing—a plan expense feature that may not be available with lower-cost share classes.[31] For this reason, the DOL has advised fiduciaries to consider the impact of share-class selection on the ***total costs*** incurred by plan participants for a plan's administrative services, without viewing myopically the investment cost of a fund alone. *See* DOL Advisory Op. 2013-03A, at 3 ("[R]esponsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly to [its service providers] for services is reasonable, taking into account the services provided to the plan ***as well as all fees or compensation received by [the service provider] in connection with the investment of plan assets, including any revenue sharing***." (emphasis added)); *see also* DOL, A Look at 401(k) Plan Fees, at 9 ("[D]on't consider fees in a vacuum. They are only one part of the bigger picture . . . ."). In other contexts, the Second Circuit has warned that, in determining prudence, an investment should not be "assessed in isolation," but as

---

[31] As Plaintiffs note in the FAC, revenue-sharing payments can help pay the Plan's administrative expenses, which, if not paid indirectly through revenue sharing may have to be deducted directly from Plan participants' accounts. FAC ¶ 63. Indeed, revenue sharing is "[t]he most common arrangement sponsors have for payment of administration and recordkeeping fees." Deloitte Development LLC, Annual Defined Contribution Benchmarking Survey 29 (2014), *available at* http://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-annual-defined-contribution-benchmarking-survey2013-081914.pdf.

part of the "whole." *PBGC*, 712 F.3d at 717.  Plaintiffs' share class allegations, isolated from

any discussion of how the investments affect the Plan's total costs, do not "demonstrate 'more

than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* at 718 (citation omitted).

### 5. Failure to Investigate Separate Accounts or Collective Trusts

Plaintiffs' final contention as to why Count I alleges facts suggestive of a deficient

process is that Defendants allegedly failed to investigate (and failed to utilize) separate accounts

and collective trusts in lieu of mutual funds for actively managed investments.  FAC ¶¶ 108-119.

However, these allegations, too, do not permit a reasonable inference of an imprudent process.

First, Plaintiffs' allegation, and the inference they ask this Court to make, is plainly

contradicted by the disclosures identified in the FAC (¶ 80 (quarterly fee disclosures); ¶ 24

(Forms 5500)), which make clear that the Plan ***did*** offer a separate account, the Stable Value

Fund,[32] and numerous collective trusts.[33]  It is simply implausible to suggest that Plan fiduciaries

had not considered the very type of investment vehicles that they in fact offered under the Plan.

Second, courts have long recognized that comparing mutual funds to separate accounts or

collective trusts is not an apples-to-apples comparison.  Mutual funds are SEC-registered

investment vehicles that offer greater transparency and ease of valuation, *see Loomis v. Exelon

Corp.*, 658 F.3d 667, 671-72 (7th Cir. 2011); portability of participant investments from plan to

plan, *id.* at 672; and substantial safeguards, including diversification requirements, leverage

limitations, and mandatory oversight by a primarily independent board of directors.  *See* 15

U.S.C. § 80a-1 *et. seq.*; 17 C.F.R. § 270.0-1(a)(7).  In contrast, institutional investment vehicles

such as separate accounts or collective trusts do not have to comply with SEC requirements, and

they may have other drawbacks, like not permitting investors (such as retirees) to withdraw

---

[32] *See, e.g.,* 404a-5 Participant Fee Disclosure, at DB0001099 (Jan. 12, 2016), Santos Decl. Ex. I (Stable Value Fund
is a "separately managed account that may utilize collective investment funds as part of its investment strategy").
[33] 2014 Form 5500, at DB0001086, Santos Decl. Ex. B.

money daily or move their money between investments without a fee.  *See Loomis*, 658 F.3d at

672.  They also lack the benchmark comparisons and valuation standards that mutual funds offer,

among other differences.  *See id.*

Given the numerous advantages that mutual funds offer over other investment vehicles,

and their widespread use in even the largest plans, *see Loomis*, 658 F.3d at 671-72; *see also*

*Renfro*, 671 F.3d at 326-27; *Hecker*, 556 F.3d at 584, selecting mutual funds simply cannot give

rise to an inference of procedural imprudence.  *See PBGC*, 712 F.3d at 719 (circumstantial facts

alleged must be "suggestive of, rather than merely consistent with, a finding of misconduct").

Because collective trusts and separate accounts *were* offered under the Plan, and because

the use of mutual funds is not only common but has repeatedly been held to create no inference

of imprudence, Plaintiffs' mutual fund based allegations fail.

* * *

In sum, Plaintiffs' breach of fiduciary duty allegations are nearly indistinguishable from

claims that courts have repeatedly rejected.  Accordingly, Count I should be dismissed.

### C.   Plaintiffs Fail to State Any Prohibited Transaction Claim (Counts II, III)

Counts II and III, asserting prohibited transaction claims, should also be dismissed.

ERISA expressly exempts the use of proprietary investment products from ERISA § 406, and it

is clear from the face of the Complaint that Plaintiffs' allegations do not support an inference that

the conduct at issue here falls outside of the relevant exemptions.

As noted above, ERISA expressly exempts from its prohibited transaction rules the very

conduct that Plaintiffs' challenge—plan investments in proprietary funds.  *See, e.g.*, ERISA

§ 408(b)(8); *supra* p. 15.  PTE 77-3, promulgated by the DOL, similarly authorizes plans

sponsored by mutual fund advisers and their affiliates to invest in affiliated mutual funds.  42

Fed. Reg. 18,734, 18,734-35 (Mar. 31, 1977).  Section 408(b)(8) applies as long as, among other

things, the affiliated bank "receives not more than reasonable compensation."  PTE 77-3

similarly requires dealings between the plan and the mutual fund to be "on a basis no less

favorable to the plan than such dealings are with other shareholders of the investment company."

42 Fed. Reg. at 18,735.

Where it is clear from the face of a complaint that a plan's use of proprietary funds is

consistent with available exemptions, courts have sensibly dismissed prohibited transaction

claims at the pleading stage.  *See*, *e.g.*, *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329(SHS), 2010

WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) (dismissing claim because, "even in the light most

favorable to plaintiffs, the complaint asserts nothing more than that defendants purchased shares

in an affiliated mutual fund, a transaction to which 'the restrictions of section [] 406 . . . shall not

apply'"); *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001) (dismissing

claim because "[p]laintiffs do not allege that the fees paid by the Plans are not in compliance

with the requirements of PTE 77-3, or that the Plans have had dealings with the . . . [f]unds on

terms that are less favorable than are offered to other shareholders").[34]

Plaintiffs' assertion that the inclusion of proprietary funds "was on a basis that was less

favorable to Plan participants than their dealings with other shareholders," FAC ¶ 140, is based

solely on Plaintiffs' argument that Plan fiduciaries should have (i) transferred investments in

institutional shares into R6 shares and (ii) utilized collective trusts rather than mutual funds.

FAC ¶¶ 104, 118.  These alleged deficiencies are irrelevant.  The prohibited transaction

exemptions ask whether plan participants paid more than any other investor would have paid ***for***

***the same investment***—that is, whether other investors in the same share class of mutual funds

---

[34] *See also Hecker*, 556 F.3d at 581 (applicability of exemptions may be resolved on motion to dismiss, especially where the plaintiffs' complaint anticipated this defense "and thus put it in play"); *Skin Pathology Assocs., Inc. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 374-78 (S.D.N.Y. 2014) (dismissing complaint based on ERISA § 408(b)(2) exemption and pertinent DOL regulations).

85637659

paid less than Plan participants here—not whether plan participants paid more than they would have paid had their plan offered a ***different*** share class or investment option.  Plaintiffs' theory would turn every allegation of breach of fiduciary duty involving proprietary mutual funds into a prohibited transaction claim.  Not only would this make § 404(a) and § 406 coextensive, *contra Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000) ("It is a well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative."), it would completely reverse the bright line rule that investing in proprietary mutual funds does not itself constitute a prohibited transaction under § 406.

Because the Complaint does not plead any facts that would deny the availability of the relevant exemptions, Counts II and III should be dismissed.[35]

### D.     Plaintiffs Fail to State a Claim for Equitable Restitution (Count V).

Finally, Count V should be dismissed as well.  This count seeks equitable restitution under ERISA § 502(a)(3) against DB AG, DBAHC, DSC, DIMA, and RREEF in their capacity as employers to the extent they received fees for investment management or transfer agent services that they or their subsidiaries provide to the Plan's proprietary mutual funds.  This claim should be dismissed because (i) Plaintiffs are not eligible for equitable restitution, and (ii) Plaintiffs fail to allege any factual basis for their conclusory allegation that DSC, DIMA, and RREEF have received any "ill-gotten assets."  FAC ¶ 159.[36]

As the Supreme Court has held, "the term 'equitable relief' in § 502(a)(3) must refer to those categories of relief that were ***typically*** available in equity."  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (citation omitted) (emphasis in original); *accord*

---

[35] Plaintiffs' failure-to-monitor claim (Count IV) is wholly derivative of Counts I-III and therefore falls on the same grounds.  *See In re Citigroup ERISA Litig.*, 662 F.3d at 145 (dismissing derivative claims for complaint's failure to state underlying claims under ERISA), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459 (2014).
[36] In addition, this claim fails because it is entirely derivative and duplicative of Plaintiffs' claims against Plan fiduciaries under ERISA §§ 404(a) and 406.  Because the substantive claims fail, this remedial claim fails as well.

85637659

*Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657

(2016).  Restitutionary remedies such as constructive trusts are available in equity only "where

money or property identified as belonging in good conscience to the plaintiff c[an] clearly be

traced to particular funds or property in the defendant's possession."  *Great-W.*, 534 U.S. at 213;

*see also Augienello v. Coast-to-Coast Fin. Corp.*, No. 01 CIV. 11608 (RWS), 2002 WL

1822926, at *5 (S.D.N.Y. Aug. 7, 2002) (only "the imposition of a constructive trust or equitable

lien ***on particular property***[] could be characterized as equitable relief" under § 502(a)(3)

(emphasis added)), *aff'd*, 64 F. App'x 820 (2d Cir. 2003).  Otherwise, they constitute requests for

restitution at law or money damages that are not permitted under § 502(a)(3).  *Great-W.*, 534

U.S. at 209-10.  Accordingly, this court has dismissed claims against non-fiduciaries for

disgorgement of "excessive fees" where the revenue cannot "clearly be traced to particular funds

or property" in defendants' possession.  *E.g.*, *Nechis v. Oxford Health Plans, Inc.*, 328 F. Supp.

2d 469, 478 (S.D.N.Y. 2004) (dismissing § 502(a)(3) restitution claim for failure to allege that

the funds sought "exist in a separately identifiable account"), *aff'd*, 421 F.3d 96 (2d Cir. 2005).[37]

Plaintiffs do not allege that any of the money they seek to disgorge can be traced to

particular funds or property in these Defendants' possession.  Nor could they.  The funds sought

by Plaintiffs are necessarily the expenses of the mutual funds they have selected for their Plan

accounts.  Plaintiffs have not alleged, nor could they, that the advisers of these funds have

segregated the fees received from such investments, or any of the Plans' investments, from any

other mutual fund fees they receive.  Therefore, even though they style their request as one for

"equitable restitution" or a constructive trust, it is in fact a request for restitution at law or money

damages and therefore impermissible under § 502(a)(3).  *See Nechis*, 328 F. Supp. 2d at 478.

---

[37] *See also Chilko v. Lorren*, No. 07-cv-1316, 2008 WL 3154734, at *5 (E.D. Cal. Aug. 3, 2008) (denying plaintiff's motion for default judgment under ERISA § 502(a)(3) because plaintiff failed to allege "specifically identifiable property that is within the control or possession of the defendant").

27

85637659

Plaintiffs' claims against DSC, DIMA, and RREEF also fail to state a claim upon which relief can be granted because there are no well-pleaded allegations that the fees received by these entities were excessive or that they had the requisite knowledge of that fact to be liable for equitable remedies.  The claims are premised on Plaintiffs' allegations that these Defendants received unreasonably high compensation for their services.  FAC ¶ 32 ("DIMA provides investment management services for which it receives compensation that is unreasonably high . . . ."); *accord id.* ¶ 34 (same with respect to RREEF); *id.* ¶ 41 ("DSC is paid shareholder servicing fees . . . and this compensation is unreasonably high . . . .").  These allegations are wholly conclusory because Plaintiffs plead no facts concerning the fees that these Defendants received, let alone facts to support the allegation that the fees are unreasonable compared to the services rendered or the fees charged by other providers.  Further, the Complaint contains no well-pleaded facts that those Defendants knew that the fees were unreasonable—the lack of well-pleaded scienter dooms this count given the Supreme Court's mandate that a plaintiff may recover from non-fiduciaries under ERISA § 502(a)(3) only where the non-fiduciaries "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 251 (2000).

Plaintiffs' claim for equitable restitution should therefore be dismissed.

### III.   Counts I, II, and III Against DIMA and RREEF Fail for Lack of Fiduciary Status.

Plaintiffs seek monetary damages directly against the "Fiduciary Defendants" under Counts I, II, and III.  In addition to the reasons set forth above as to why these claims are deficient, these claims also fail specifically as to DIMA and RREEF because Plaintiffs do not and cannot adequately allege that these two Defendants are relevant fiduciaries of the Plan.

ERISA §§ 404(a)(1) and 406 govern the conduct of a plan's ***fiduciaries***; only ***fiduciaries*** may be liable for monetary damages pursuant to ERISA § 409, 29 U.S.C. § 1109.  *See* ERISA

§ 404(a)(1) ("a fiduciary shall discharge his duties with respect to a plan . . ."); *id.* § 406(a) ("A fiduciary with respect to a plan shall not . . . ."); *id.* § 406(b) ("No fiduciary who has authority or discretion to control or manage the assets of a plan shall . . . ."); *id.* § 409 ("Any person who is a fiduciary with respect to a plan . . . shall be personally liable to make good to such plan . . . ."). Under ERISA, one is a fiduciary with respect to a plan only to the extent that she (i) exercises discretionary authority or control over the management of the plan or its assets, (ii) renders investment advice for a fee with respect to plan assets, or (iii) has discretionary authority of plan administration.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); *PBGC*, 712 F.3d at 710 n.4.

Plaintiffs attempt to establish relevant fiduciary status by asserting that DIMA and RREEF are investment advisers that "exercise[] authority or control respecting management or disposition of Plan assets" and "render[] investment advice for a fee or . . . with respect to monies of the Plan."  FAC ¶¶ 32, 34.  But these conclusory assertions mischaracterize the role of DIMA and RREEF and are not supported by the facts alleged.  A company falls within § 3(21)(A) only if it provides investment advice or has discretionary authority with respect to assets *of the plan*.  DIMA and RREEF are not investment advisers *to the Plan*:  Plaintiffs do not allege (nor could they) that DIMA or RREEF provide any advice to the Investment Committee regarding the investment options that should be offered to Plan participants.  Instead, as Plaintiffs allege, DIMA and RREEF are investment advisers *to mutual funds in which Plan participants invest*.  FAC ¶ 32 ("DIMA has served as the investment advisor to the Deutsche Bank mutual funds held within the Plan."); *id.* § 34 ("RREEF has served as the investment sub-advisor to the Deutsche Real Estate Securities Fund, a mutual fund held within the Plan.").

This distinction is not a mere technicality.  ERISA expressly excludes mutual fund assets from its definition of plan assets.  *See* ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1); *see also* 29

C.F.R. § 2510.3-101 ("[W]hen a plan invests in another entity, the plan's assets include its

investment, but do not, solely by reason of such investment, include any of the underlying assets

of the entity.").  And this exclusion was intentional.  As Congress explained, mutual funds are

already regulated by the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*, and mutual

fund advisers are already subject to liability under that Act and the companion Investment

Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, based on the investment advice they provide to

mutual funds; therefore, "it is not considered necessary to apply [ERISA's] fiduciary rules to

mutual funds."  H.R. Conf. Rep. No. 93-1280, at 296, *quoted in IATSE Local 33 Section 401(k)

Plan Bd. of Trs. v. Bullock*, No. 08-3949, 2008 WL 4838490, at *6 (C.D. Cal. Nov. 5, 2008).

Because the assets of mutual funds are not "plan assets," by acting as an investment

manager or sub-adviser to mutual funds offered by the Plan as investment options, DIMA and

RREEF were not exercising discretionary authority, or rendering investment advice for a fee,

with respect to plan assets.  29 U.S.C. § 1002(21)(A).  Consequently, DIMA and RREEF are not

Plan fiduciaries and cannot be sued for monetary damages under Counts I, II, and III.[38]

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed in its entirety with prejudice.

---

[38] Because, as established above, Plaintiffs are not entitled to equitable disgorgement under ERISA § 502(a)(3), and because they cannot sue DIMA and RREEF for monetary damages under §§ 404(a) or 406, DIMA and RREEF (along with the rest of the non-fiduciary Defendants) must be dismissed from this action with prejudice.

85637659

Dated:  April 29, 2016                           Respectfully Submitted,

                                                 /s/ Jamie O. Fleckner_____
                                                 Jamie O. Fleckner, *admitted pro hac vice*
                                                 Alison V. Douglass, *admitted pro hac vice*
                                                 Jaime A. Santos, *admitted pro hac vice*
                                                 GOODWIN PROCTER LLP
                                                 Exchange Place
                                                 Boston, MA 02109
                                                 (617) 570-1000

                                                 Richard M. Strassberg
                                                 GOODWIN PROCTER LLP
                                                 The New York Times Building
                                                 620 Eighth Avenue
                                                 New York, NY 10018
                                                 (212) 813-8800

                                                 *Attorneys for Defendants*

85637659

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 /s/ Jaime A. Santos
Jaime A. Santos

32

85637659