## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ramon Moreno, Donald O'Halloran, Omkharan Arasarantnam, Baiju Gajjar, and Rajath Nagaraja, individually and as representatives of a class of similarly situated persons, and on behalf of the Deutsche Bank Matched Savings Plan, <br><br>                       Plaintiffs, <br><br> v. <br><br> Deutsche Bank Americas Holding Corp., Deutsche Bank Matched Savings Plan Investment Committee, Deutsche Bank Americas Holding Corp. Executive Committee, Aon Hewitt Investment Consulting Inc., Richard O'Connell, John Arvanitis, Robert Dibble, Tim Dowling, Richard Ferguson, James Gnall, Louis Jaffe, Patrick McKenna, David Pearson, Joseph Rice, Scott Simon, Andrew Threadgold, James Volkwein, and John Does 1–15, <br><br>                       Defendants. | Case No. 1:15-cv-09936 (LGS) <br><br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.     Plaintiffs Ramon Moreno, Donald O'Halloran, Omkhar Arasarantnam, Baiju Gajjar, and Rajath Nagaraja ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the Deutsche Bank Matched Savings Plan (the "Plan" or the "Deutsche Bank Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Plan's fiduciaries.[1]  As

---

[1] The Plan fiduciaries who are the subject of this action are: Deutsche Bank Americas Holding Corp. ("DBAHC"), the Deutsche Bank Matched Savings Plan Investment Committee ("Investment Committee"), the Deutsche Bank Americas Holding Corp. Executive Committee ("Executive Committee"), Aon Hewitt Investment Consulting Inc. ("AHIC"), Richard O'Connell, John Arvanitis, Robert Dibble, Tim Dowling, Richard Ferguson, James Gnall, Louis

described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.  Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

3.      Defendants do not act in the best interest of the Plan and its participants.  Instead, Defendants use the Plan as an opportunity to promote the business interests of Deutsche Bank[2] at the expense of the Plan and its participants.

4.      For example, the Plan had over $300 million invested in the Deutsche Equity 500 Index Fund (which mimics the S&P 500 index) in 2009, 2010, 2011, and 2012, even though the fees for that index fund were **eleven times higher** than a comparable index fund from Vanguard that had the identical mix of investments.  Despite the obvious imprudence of this proprietary index fund, Defendants retained this fund in the Plan until February 2013 (when it was belatedly

---

Jaffe, Patrick McKenna, David Pearson, Joseph Rice, Scott Simon, Andrew Threadgold, James Volkwein, and John Does 1–30 (collectively referred to herein as "Defendants").

[2] "Deutsche Bank" shall refer collectively to Deutsche Bank AG ("DB AG") and the family of companies, services, and products subject to DB AG's direct or indirect control.  Deutsche Bank includes, but is not limited to, Defendant DBAHC, Deutsche Investment Management Americas Inc. ("DIMA"), DeAWM Service Company ("DSC"), and RREEF America LLC ("RREEF").  DIMA and RREEF are investment adviser firms registered with the Securities and Exchange Commission under the Investment Company Act of 1940.

removed), costing Plan participants millions of dollars in investment management fees that went directly into Deutsche Bank's pocket.

5.     In addition, the Plan had hundreds of millions of dollars invested in other actively-managed proprietary funds that had significantly higher fees than comparable funds and a track record of poor performance.  In 2009, 2010, 2011, 2012, 2013, 2014, and 2015, Deutsche Bank rated among the worst mutual fund companies in the United States over the prior five- and ten-year periods, and funds within the Plan,[3] such as the Deutsche Capital Growth Fund and the Deutsche Large Cap Value Fund, consistently underperformed their benchmark indices. Notably, as of the end of 2014, **not a single defined contribution plan** among the more than 1,400 plans with over $500 million in assets included these funds among its investment offerings – other than the Deutsche Bank Matched Savings Plan.  Every other fiduciary acting under similar circumstances had either avoided these funds entirely or removed them given their obvious imprudence.  Yet, despite the overwhelming evidence that these funds and other proprietary funds in the Plan were imprudent, Defendants failed to remove these proprietary funds from the Plan.  Defendants' failure to remove these imprudent proprietary mutual funds from the Plan has cost Plan participants tens of millions of dollars in excess fees and lost earnings compared to prudent alternatives.

6.     Defendants further compounded their imprudence by failing to utilize the least expensive available share class for several mutual funds within the Plan.  For example, Defendants retained so-called institutional shares of the Deutsche Capital Growth Fund and

---

[3] Deutsche Bank's proprietary mutual funds were named DWS funds until August 2014, when they were renamed the Deutsche funds (the funds were known as the DWS Scudder funds before changing their name to the DWS funds).   For purposes of consistency and clarity, the Second Amended Complaint shall refer to these funds as having been named "Deutsche" from 2009 to the present.

Deutsche High Income Fund with expense ratios of 0.71% and 0.69%, respectively, even though otherwise identical R6 shares of the same funds became available in August 2014 and had lower expense ratios of 0.60% and 0.62%.  In addition, Defendants retained share classes in other funds that were more expensive than alternative share classes from the same funds.  A prudent investor would not have retained these more expensive share classes when other less expensive share classes were available.

7.      Defendants also failed to investigate the use of separate accounts and collective trusts as alternatives to mutual funds, even though they are typically less expensive and offer the same types of investments.  For example, the Plan remained invested in the Deutsche Capital Growth mutual fund, which had an expense ratio of 0.71% in 2014, even though Deutsche Bank offered its institutional clients a separately-managed account in the same investment style that was significantly less expensive and would have cost at most only 0.43% per year, based on the amount invested by the Plan.

8.      Defendants also caused the Plan to pay grossly excessive recordkeeping fees to Deutsche Bank's close business partner ADP, Inc. ("ADP").  The Plan's recordkeeping fees were paid through a system known as "revenue sharing," whereby a portion of the investment management fees paid by participants are directed to the plan's recordkeeper. A reasonable fiduciary would have monitored these "revenue sharing" payments closely, capped revenue sharing at the reasonable value of recordkeeping services, and reclaimed any excess for the benefit of the Plan and its participants.  Defendants did not take these steps and instead allowed ADP to retain grossly excessive compensation equal to two to three time times a reasonable recordkeeping fee.  Paying excessive compensation to a close business partner furthered the business interests of Deutsche Bank at the expense of Plan participants.

4

9.      The imprudent manner in which Defendants managed the Plan was not the result of mere negligence or oversight.  To the contrary, Defendants consistently retained high-cost and poor-performing proprietary Deutsche Bank mutual funds in the Plan because Deutsche Bank earned millions of dollars in investment management fees by retaining them in the Plan. Deutsche Bank also used the Plan's recordkeeping contract to further a close business relationship, failing to act while Plan participants paid grossly excessive recordkeeping fees that could have instead gone back to participants.  By doing so, Defendants breached their duty of loyalty, as well as their duty of prudence, in violation of 29 U.S.C. § 1104.

10.     Moreover, Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1106.

11.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), engaging in prohibited transactions with a party-in-interest (Count Two), engaging in prohibited transactions with a fiduciary (Count Three), and failure to monitor fiduciaries (Count Four).

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

15.     Plaintiff Ramon Moreno resides in Rockville Centre, New York, and was a participant in the Plan until 2010, when his account balance was distributed from the Plan. Moreno is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Moreno was invested in three different funds offered within the Plan within six years of the filing of this action (Deutsche High Income, Deutsche RREEF Real Estate Securities, Deutsche Bank Stable Value), all three of which were proprietary.  Moreno has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

16.     Plaintiff Donald O'Halloran resides in Bayonne, New Jersey, and was a participant in the Plan until July 2015, when his account balance was distributed from the Plan. O'Halloran is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein.  O'Halloran was invested in seven of the Plan's designated investment alternatives between November 2009 and July 2015, including three that were affiliated with Deutsche Bank (Deutsche Equity 500 Index, Deutsche Capital Growth, Deutsche Large Cap Value).  O'Halloran has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

6

17.     Plaintiff Omkhar Arasarantnam resides in New York, New York and is a participant in the Plan. Arasarantnam has invested in at least five of the Plan's designated investment alternatives since November 2009, including at least one affiliated with Deutsche Bank (Deutsche Bank Stable Value Fund). Arasarantnam has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

18.     Plaintiff Baiju Gajjar resides in Chicago, Illinois and is a participant in the Plan. Gajjar has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Gajjar has invested in at least six of the Plan's designated investment alternatives since November 2009, including at least two that were affiliated with Deutsche Bank (Deutsche Core Fixed Income and Deutsche High Income). Gajjar has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

19.     Plaintiff Rajath Nagaraja resides in Piscataway, New Jersey and is a participant in the Plan. Nagaraja has invested in at least eight of the Plan's designated investment alternatives since November 2009, including at least two that were affiliated with Deutsche Bank (Deutsche Large Cap Value and Deutsche Real Estate Securities Fund). Nagaraja has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

### THE PLAN

20.     The Plan was established on October 1, 1993 through the merger of three different Deutsche Bank plans.  On January 1, 2005, the Plan name was changed from the "Deutsche Bank Americas Holding Corp. Matched Savings Plan" to the "Deutsche Bank Matched Savings Plan."  The Plan was amended and restated effective January 1, 2009, then amended and restated

again effective January 1, 2012.[4]   The Plan also has entered into a Trust Agreement with the

Plan's Trustee.   The Trust Agreement was "adopted as part of the Plan" and thus, together, the

Plan Document and Trust Agreement constitute the Plan's governing documents.   Plan

Document § 1.5.

21.   The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C.

§ 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

22.   The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to

as a "401(k) plan."

23.   The Plan covers all eligible employees of Deutsche Bank in the United States. *See*

Deutsche Bank U.S. Resolution Plan Submission at 14 (July 2015), *available at*

http://www.federalreserve.gov/bankinforeg/resolution-plans/deutsche-bank-1g-20150701.pdf.

24.   The Plan is a defined-contribution or 401(k) plan, a type of employee retirement

plan in which employees invest a percentage of their earnings on a pre-tax basis.   The employer

often matches those contributions up to a certain percentage of the compensation contributed by

the employee each pay period.   Within the Plan, employees may defer anywhere from 1% to

40% of their compensation on a pre-tax basis (subject to annual contribution limits), and

Deutsche Bank matches those contributions up to either 4% or 5% of the employee's salary,

depending upon the employee's hire date.   Plan Document § 5.2.

25.   Participants in a defined-contribution plan are responsible for directing the

investment of these contributions, choosing from among a lineup of options offered by the Plan.

*See* Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2015), *available at*

---

[4] All references and citations to the Plan Document shall refer to the 2012 Plan Document.
However, Plaintiffs are not aware of any differences between the 2009 and 2012 Plan Document
that are material to this action.

https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf (hereinafter "ICI Study").  As a result, the investment lineup determined by the Plan's fiduciaries is critical to participants' investment results and ultimately the retirement benefits they receive.

**DEFENDANTS**

**DBAHC**

26.     DBAHC is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B).  DBAHC provides the funding for the Plan, while allocating the cost to other Deutsche Bank entities in the United States based upon their headcount.  DBAHC is headquartered in New York City, and is a wholly-owned subsidiary of DB AG.  The "primary purpose" of DBAHC is to "serve as the vehicle" for Deutsche Bank's pension and benefit plans.  Deutsche Bank U.S. Resolution Plan Submission at 16.  DBAHC is not responsible for any "core business lines or critical operations", and therefore DBAHC is financially dependent upon its affiliates and parent corporation. *Id.*

27.     As the Plan Sponsor, DBAHC is responsible for appointing, removing, and monitoring members of the Executive Committee.  DBAHC also has ultimate authority over the terms and operation of the Plan's Trust, as it is the only party authorized to change the terms of the Plan's Trust under Section 12 of the Trust Agreement.  Although the Plan Document grants authority for appointing and overseeing the Trustee to the Investment Committee, the Trust Agreement was negotiated and executed by DBAHC.  Because the Trust Agreement contains provisions regarding, among other things, Plan recordkeeping, revenue sharing with the Trustee, and the Plan's investment options, DBAHC's authority to negotiate, execute, and alter the terms of the Trust Agreement gives it authority and control respecting management of the Plan and the Plan's assets.  By virtue of DBAHC's various powers and duties, DBAHC exercises discretionary authority or discretionary control respecting management of the Plan, exercises

9

authority or control respecting management or disposition of the Plan's assets, and/or has discretionary authority or responsibility in the administration of the Plan.  DBAHC is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

28.     In addition, the Plan's Form 5500s for 2009 through 2014 (filed with the United States Departments of Labor and Treasury) state that DBAHC is the Plan Administrator.  To the extent that this representation in the Form 5500s is accurate, DBAHC is also a fiduciary by virtue of its position in regards to the administration of the Plan.  *See* 29 C.F.R. § 2509.75-8 at D-3.  Further, as the sponsor of the Plan, and a participating employer in the Plan, DBAHC is a "party in interest" under 29 U.S.C. § 1002(14).

***The Investment Committee***

29.     The Investment Committee is named by the Plan as one of the parties responsible for administering and managing the Plan, and therefore it is a named fiduciary pursuant to 29 U.S.C. § 1102(a).   The Investment Committee's duties include recommending investment objectives and policies to the Executive Committee; determining the number and category of investments that will be offered under the Plan; selecting the investments to be offered by the Plan; adding and deleting Plan investments; monitoring the performance of Plan investments; hiring and removing investment managers as defined by 29 U.S.C. § 1002(38); and hiring the Plan's trustee and monitoring the performance of said trustee. Plan Document § 10.8. Pursuant to these authorized duties and functions, the Investment Committee and its members exercise discretionary control respecting management of the Plan; exercise authority or control respecting management or disposition of Plan assets; and have discretionary authority or responsibility in administration of the Plan. The Investment Committee and its members are therefore functional fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21)(A).   Defendants Arvanitis, Dibble,

Dowling, Ferguson, Gnall, Jaffe, McKenna, O'Connell, Pearson, Rice, Simon, Threadgold, and Volkwein served on the Investment Committee during the putative class period.

***Richard O'Connell***

30.     Defendant Richard O'Connell is the Deutsche Bank Americas Region Head of Reward.   As the Deutsche Bank Americas Region Head of Reward, O'Connell is the Plan Administrator according to the Plan Document (Plan Document § 2.1), and a named fiduciary pursuant to 29 U.S.C. § 1102(a). *See* 29 C.F.R. § 2509.75-8 at D-3 (explaining that the plan administrator is generally a plan fiduciary).

31.     As Plan Administrator, O'Connell is responsible for "establish[ing] and administer[ing] rules and procedures with respect to all matters relating to the election and use of the Investment Funds" (Plan Doc. § 10.9(b)(xiv)); supervising all DBAHC employees who perform functions related to the operation of the Plan (*id.* § 10.9(b)(xi)); "monitor[ing] and supervis[ing] the activities of the Plan Recordkeeper and other third-party administrators appointed for the Plan" (*id.* § 10.9(b)(iv)); and "mak[ing] and enforc[ing] such rules and regulations as [the Plan Administrator] shall deem necessary or proper for the efficient administration of the Plan." *Id.* § 10.9(b)(i).  These various powers and duties give O'Connell discretionary authority and responsibility in the administration of the Plan, permit O'Connell to exercise discretionary authority or control respecting management of the Plan, and allow O'Connell to exercise authority or control respecting management or disposition of Plan assets. O'Connell has also been a member of the Investment Committee.  Accordingly, O'Connell is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

***The Executive Committee***

32.     The Executive Committee is responsible under the Plan Document for appointing

and removing members of the Investment Committee.  Plan Document §§ 10.1(b), 10.6(b).  The

Executive Committee is also responsible for "evaluat[ing] as necessary the performance of the

Investment Committee and any Employee engaged in the management and administration of the

Plan or Trust fund."  Plan Document § 10.6.  Because the Plan Document gives the Executive

Committee specific duties related to the management of the Plan, the Executive Committee is a

named fiduciary of the Plan pursuant to 29 U.S.C. § 1102(a).

33.     The Executive Committee and its members are also functional fiduciaries

pursuant to 29 U.S.C. § 1002(21)(A).  Because they are responsible for appointing, removing,

and monitoring the performance of other committee members with duties relating to the Plan, the

Executive Committee and its members possess discretionary authority and responsibility with

respect to the administration of the Plan, and also possess discretionary authority or control

respecting management of the Plan. Further, because the Executive Committee and its members

are responsible for monitoring and evaluating the performance of the Investment Committee in

particular, and have authority over the Investment Committee (including the authority to remove

Investment Committee members who fail to satisfy ERISA's standards), the Executive

Committee and its members exercise authority or control respecting management or disposition

of Plan assets through their actions and omissions.  Defendants Arvanitis, Dibble, Ferguson,

Gnall, McKenna, and Simon served on the Executive Committee during the putative class

period.

***Fiduciary Delegates***

34.     DBAHC, the Investment Committee and its members, O'Connell, and the

Executive Committee and its members possess the authority to delegate their responsibilities to

any other person or persons.  Plan Document § 10.10.  Any individual or entity to whom these

Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).  Because the individuals and/or entities that have been delegated fiduciary responsibilities by Defendants are not currently known to Plaintiffs, they are collectively named as John Does 1–15.

*AHIC*

35.    AHIC, formerly known as Hewitt Investment Group LLC and Hewitt EnnisKnupp, provided investment advisory services to the Plan during the relevant time.  AHIC was responsible for working with the Investment Committee to (1) select investment options to be included in the Plan, (2) monitor those investments to ensure that they remained prudent, and (3) recommend changes to the Plan's investment lineup. AHIC was paid fees from Plan assets in exchange for its advice regarding the investment of Plan assets.  AHIC is a functional fiduciary of the Plan pursuant to 29 U.S.C. 1002(21)(A)(i) and (ii) because AHIC exercised any authority or control respecting disposition of Plan assets and rendered investment advice for a fee with respect to Plan assets. AHIC is headquartered in Chicago, Illinois.

NON-PARTY AFFILIATES

*DIMA*

36.    DIMA is directly owned by DBAHC, and both companies are subsidiaries of parent company DB AG.  DIMA is a participating employer in the Plan, and at all relevant times, DIMA has served as the investment advisor to the Deutsche Bank mutual funds held within the Plan.

13

*RREEF*

37.     RREEF is directly owned by DBAHC, and both companies are subsidiaries of parent company DB AG.  RREEF is a participating employer in the Plan, and at all relevant times RREEF has served as the investment sub-advisor to the Deutsche Real Estate Securities Fund, a mutual fund held within the Plan.

*DB AG*

38.     DB AG is headquartered in Frankfurt, Germany, and is the parent corporation of all Deutsche Bank entities, including DBAHC, DIMA, RREEF, and DSC.  According to Appendix A of the 2009 Plan Agreement, DB AG is a Plan employer.  Further, according to the 2012 Plan Agreement, the New York branch of DB AG has employees that participate in the Plan.  As a participating employer in the Plan and the parent company of the Plan sponsor, DB AG is a "party in interest" under 29 U.S.C. § 1002(14).  DB AG exerts common financial and operational control of its subsidiaries in the United States through its control of their funding, accounting, personnel, human resources, facilities, systems, services, and transactional booking models.  Deutsche Bank U.S. Resolution Plan Submission at 14, 16-17.

39.     Deutsche Asset & Wealth Management ("AWM") is a division of DB AG responsible for DB AG's global asset management businesses.  DBAHC, DIMA, DSC, and RREEF are all part of DB AG's AWM division, and are furthermore treated as a division of DB AG within DB AG's Annual Financial Statements.  According to DB AG's Annual Financial Statements, all revenues generated by AWM entities are reported as revenues of DB AG.

*DSC*

40.     DSC is part of the AWM Division of DB AG, and is a wholly-owned subsidiary of DB AG.  DSC is a Plan employer.

41.     DSC is the transfer agent, dividend-paying agent, and shareholder service agent

for the Deutsche Bank mutual funds in the Plan.  DSC is paid shareholder servicing fees as a percentage of the assets held in each of these mutual funds.  Consequently, DSC receives revenues from the Plan's investments in Deutsche Bank mutual funds, and this compensation is unreasonably high and comes at the expense of the Plan and its participants.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

42.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

43.     "The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan*, 680 F.2d at 272 n.8).

### DUTY OF LOYALTY

44.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id.* at 224 (quotation marks and citations omitted).  Thus, "in

15

deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).  Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271.

## DUTY OF PRUDENCE

45.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).  Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litigation II*, 2011

WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

46.     Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty.  *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).  Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available.  *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015).

### SOURCE AND CONSTRUCTION OF DUTIES

47.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts."  *Tibble*, 135 S. Ct. at 1828.  Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."  *Id.; accord La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (explaining that the duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts").  In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

48.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship."  Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").  The Introductory Note to the Restatement's chapter on trust investment further clarifies:

17

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets.  In addition, **this emphasis reflects the availability and continuing emergence of modern investment products**, not only with significantly varied characteristics but also **with similar products being offered with significantly differing costs**.  The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.  In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added).  Where markets are efficient, fiduciaries are encouraged to use low-cost index funds.  *Id.* § 90 cmt. h(1).  While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . .  [T]hese added costs . . . must be justified by realistically evaluated return expectations."  *Id.* § 90 cmt. h(2).

### PROHIBITED TRANSACTIONS

49.    The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse.  Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *
>
> (C)    furnishing of goods, services, or facilities between the plan and  party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

18

Section 1106(b) further provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

    (1)    deal with the assets of the plan in his own interest or for his own account,

    (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

    (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### CO-FIDUCIARY LIABILITY

50.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

51.    In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of designated investment alternatives.  29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).  A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants and beneficiaries may direct the investment of assets held in, or contributed to, their individual accounts."  29 C.F.R. § 2550.404a-5(h)(4).

52.     Each investment option within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts.  ICI Study at 7.  In fact, the Deutsche Bank Plan specifically provides that the Plan's investment options may include mutual funds, separately managed accounts, and unregistered commingled funds.  Plan Document § 11.2.  These pooled investment products generally offer investors exposure to a particular asset class or sub-asset class.  Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

53.     The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.  Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.  Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 day and 30 years), and the default risk associated with the particular borrower.  Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.  Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between).  Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds.  Target-date funds assemble a

broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

54.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.  For example, within each of the Deutsche Bank funds in the Plan, DIMA is paid a monthly investment management fee in exchange for directing the investment of the fund's assets.

55.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).  By following this strategy, index funds produce returns that are very close to the market segment tracked by the index.  *Id.*  Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses.  *Id.*  Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection.  *Id.* at 485–86.  Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized).  U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

56.     In addition to a menu of designated investment alternatives, many plans (including the Deutsche Bank Matched Savings Plan) provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds,

and mutual funds.  Ayres & Curtis, *Beyond Diversification* at 1524.  However, SDBAs have significant drawbacks.  Participants that choose to utilize an SDBA typically are assessed an account fee and a fee for each trade. These fees are not charged when investing in designated investment alternatives available within the Plan.[5]  Costs are also higher because persons who invest in mutual funds within an SDBA typically must invest in retail mutual funds, rather than lower-cost institutional shares that are only available to retirement plans because of their ability to leverage the negotiating power of the plan's assets.  DOL Field Assistance Bulletin 2012-02R (July 30, 2012), *available at* http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, FIDUCIARY NEWS (June 11, 2013), *available at* http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/.  Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary responsible for selecting or monitoring the investments within an SDBA.  29 C.F.R. § 2550.404a-5(f), (h)(4).

57.  The existence of an SDBA option does not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of designated investment alternatives.  29 C.F.R. § 2550.404c-1(d)(1)(iv) (a participant's "independent control" over assets "does not serve to relieve a fiduciary from its duty to prudently select and monitor any ... designated investment alternative offered under the plan").  For the reasons described above (among others), investors in SDBAs typically experience "low real rates of return and higher retirement failure rates."  Marijoyce Ryan, CPP, *Money Management: The Downside of Self-*

---

[5] Investments available within a self-directed brokerage account are excluded from the definition of "designated investment alternative".  29 C.F.R. § 2550.404a-5(h)(4).  Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA.  *Id.* § 2550.404a-5(d).

*Directed Brokerage Accounts*, THE DAILY RECORD (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/; *see also* Dr. Gregory Kasten, Self-Directed Brokerage Accounts Reduce Success (2004), at 1, 13–14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of study showing that SDBAs lag the performance of a model portfolio of the plan's core investment options by an average of 4.70% per year).

58.     In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options.  Due to their high costs and administrative complexity, SDBAs are seldom used by participants: only 2% of retirement plan assets are held in SDBAs.  Investment Company Institute & Deloitte Consulting LLP, Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study").  Consistent with this experience, less than 2% of the Plan's assets were held in SDBAs as of the end of 2014.

### MINIMIZATION OF PLAN EXPENSES

59.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.  Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account.  Over time, even seemingly small differences in fees and performance can result in vast

differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[6] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

60.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses.  ICI/Deloitte Study at 17. Investment management expenses are the fees charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*  On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

61.     Administrative expenses (e.g., recordkeeping, trustee and custodial services, employee education, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing."  Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16.  These "revenue sharing" payments from investment managers to plan

---

[6] The term "bps" is an abbreviation of the phrase "basis points."  One basis point is equal to .01%, or 1/100th of a percent.  Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested.    *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Nov. 11, 2015).

service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula.  Though revenue sharing arrangements do not automatically constitute prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

62.     Fiduciaries exercising control over administration of the plan and the selection of designated investment alternatives can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options.  This task is made significantly easier the larger a plan gets.  Economies of scale generally result in lower administrative expenses on a per-participant or percentage-of-assets basis.  ICI/Deloitte Study at 7, 21.  Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors.  *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-

fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.33% for plans with over $1 billion in assets. ICI Study at 41.

63.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

### SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR THE PLAN

64.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan. The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent

investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

65.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).

66.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should.  John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

67.     For all of these reasons, prudent fiduciaries will limit their investment menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

68.     The second critical insight provided by academic and financial industry literature is that in evaluating prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.  Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.  Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios.  On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

69.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").  Any sustainable ability to beat the market that managers might demonstrate is typically dwarfed by mutual fund expenses.  Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*,

65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000).  The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance.  Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses.  *See* Restatement (Third) of Trusts § 90 cmt. h(2).

**DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN**

I.     **AHIC FAILED TO PROVIDE PRUDENT INVESTMENT CONSULTING SERVICES SOLELY IN THE INTEREST OF THE PLAN.**

70.    Since at least 2010, AHIC has served as a fiduciary investment advisor for the Plan.  In that capacity, AHIC plays a significant role in managing the Plan's investment lineup, and makes investment recommendations to the Investment Committee and other Plan fiduciaries.

71.    AHIC has not employed a prudent or impartial process for reviewing the Plan's investments and advising other Plan fiduciaries with respect to selection, monitoring, and removal of Plan investments. AHIC has prioritized the inclusion and retention of Deutsche Bank's funds in the Plan—recommendations AHIC did not give to other plans—in order to maintain favor with its client, Deutsche Bank, in breach of its duty of undivided loyalty the Plan. AHIC likewise failed to implement processes to review and monitor the fitness of Deutsche Bank's affiliates to serve as the Plan's most frequently used investment managers, procedures a prudent and impartial fiduciary would have implemented and followed.  Defendants' failures

described throughout this Second Amended Complaint, as such failures pertain to AHIC, were the product of AHIC's reluctance to cause tension with its client by identifying the imprudence of the Deutsche Bank funds offered in the Plan and Deutsche Bank's institutional failings as a money manager.

## II.   DEFENDANTS FAILED TO PROMPTLY REMOVE IMPRUDENT PROPRIETARY INDEX FUNDS.

72.     As of the end of 2014, defined contribution plans in the United States held $6.8 trillion in assets. Investment Company Institute, *2015 Investment Company Fact Book* (2015), *available at* https://www.ici.org/pdf/2015_factbook.pdf.  This has created a large marketplace for retirement plan services that is well-established and highly competitive.  Billion dollar plans such as the Plan wield tremendous bargaining power and can obtain high-quality investment management and administrative services at very low costs.

73.     As of the end of 2009, the Plan had approximately $1.9 billion in assets, and offered participants 22 designated investment alternatives, as well as an SDBA option.  Ten of the Plan's 22 designated investment alternatives were proprietary Deutsche Bank mutual funds. Three of these ten proprietary funds were index funds, while seven were actively managed.

74.     An index fund is a passive investment which attempts to mimic the performance of a market index rather than making subjective determinations about the merits of particular stocks or bonds.  A prudent investor seeking to invest in a fund that mimics a particular index or market will therefore select whichever fund tracks that particular market or index at the lowest cost.  *See* Gail Marks-Jarvis, *Step-by-Step Guidance on Shopping for Index Funds*, CHICAGO TRIBUNE (Aug. 16, 2015), *available at* http://www.chicagotribune.com/business/yourmoney/ct-marksjarvis-0816-biz-20150814-column.html; Jim Mitchell, *Investors Should Choose Index Funds with the Lowest Fees*, TheStreet (Mar. 10, 2015),

http://www.thestreet.com/story/13072023/3/investors-should-choose-index-funds-with-the-lowest-fees.html.

75.     The Deutsche Equity 500 Index Fund attempts to mimic the performance of the Standard & Poor's 500 Index, known as the S&P 500.   In 2009, institutional shares of the Deutsche Equity 500 Index Fund had an expense ratio of 0.23%, meaning that investors in the fund paid fees of 0.23% per year to invest in the fund.  Based on this expense ratio and the Plan's investment in this fund as of the end of 2009, the Plan could reasonably surmise as of the end of 2009 that participants would pay approximately $717,000 in expenses in 2010, plus whatever additional fees were assessed based on additional investments in the fund and increases in the fund's value.

76.     A minimal investigation conducted at the end of 2009 would have revealed that the Plan could have instead invested in Institutional Plus shares of the Vanguard Institutional Index Fund, which also seeks to mimic the performance of the S&P 500, and had an expense ratio of only 0.02% as of the end of 2009.  Had the Plan invested in the Vanguard Institutional Index Fund instead of the Deutsche Equity 500 Index Fund, Plan participants would have paid only $64,400 in fees in 2010.  The Plan did not make this change as of the end of 2009, however, and therefore **Plan participants paid more than eleven times more in fees** than they would have paid if the Plan had prudently removed the Deutsche Equity 500 Index Fund from the Plan as of the end of 2009 and invested instead in Institutional Plus shares of the Vanguard Institutional Index Fund.

77.     Retention of the Deutsche Equity 500 Index Fund became more imprudent with each passing year.  While the Vanguard Institutional Index Fund's expenses remained 0.02%, the expense ratio of the Deutsche Equity 500 Index Fund increased each year, from 0.23% in 2010,

31

to 0.24% in 2011, 0.25% in 2012, and finally 0.31% in 2013.  The Plan's investment in the fund also increased over time.  The Plan's balance in the Deutsche Equity 500 Index Fund was $312 million as of the end of 2009; $355 million as of the end of 2010; $345 million as of the end of 2011; and $388 million as of the end of 2012.  Plan participants therefore paid approximately $745,000 in excess fees in 2010; $759,000 in 2011; and $892,000 in 2012.

78.    Each year, beginning as of the end of 2009, an impartial review of the Plan's investment options coupled with a minimal investigation of available alternatives would have led a prudent investor to remove the Deutsche Equity 500 Index Fund from the Plan, and replace it with a lower cost index fund such as the Vanguard Institutional Index Fund.[7]  Defendants' failure to take this action constituted a breach of their fiduciary duties of prudence and loyalty.  *See Leber v. Citigroup 401(k) Plan Investment Committee*, 2014 WL 4851816, at *4 (S.D.N.Y. Sept. 30, 2014) ("Essential to the plausibility of plaintiffs' [breach of fiduciary duty] claims was the allegation that the [proprietary funds] charged higher fees than those charged by comparable Vanguard funds—in some instances fees that were more than 200 percent higher than those comparable funds.") (quotation and citation omitted).

79.    Finally, in February 2013, Defendants removed the Deutsche Equity 500 Index Fund and other proprietary index funds from the Plan and replaced them with comparable Vanguard index funds.  However, Plan participants were not reimbursed for the excess fees they had been paying for the past several years.

80.    Defendants attempted to conceal their imprudence from Plan participants.  The Plan provides participants with quarterly statements that summarize the performance of each Plan participant's investments and include a summary of the investment offerings within the

_____

[7] A prudent investor similarly would have replaced other Deutsche Bank proprietary index funds with other less expensive index funds offering the same investment mix.

Plan.  The statements also contain a section entitled "Plan News," which is meant to provide participants with relevant information regarding changes in the Plan.  For example, at the end of 2009, the Plan News section informed investors that as of December 1, 2009, the Plan would be providing participants with four-page summary prospectuses in lieu of full-length annual prospectus updates.

81.    The quarterly statement for the period ending March 31, 2013 made no mention of the Plan's removal of the Deutsche Bank proprietary index funds or the Plan's addition of the Vanguard index funds.  The only news items pertained to the name change from DWS Investments to Deutsche Asset & Wealth Management, and a change to the name and management team of the Deutsche Global Growth Fund.  This omission prevented Plan participants from learning of the Plan's imprudence in retaining the Deutsche index funds for the past several years, and furthermore obscured the fact that the index funds being added were nearly identical to those being replaced, with the only difference being the substantially lower costs charged by the Vanguard index funds.

## III.  DEFENDANTS RETAINED HIGH COST AND POORLY PERFORMING FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

82.    In addition to the Plan's retention of imprudent index funds, the Plan has retained several actively-managed proprietary funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence that these proprietary funds had become imprudent and were likely to perform poorly in the future.

83.    The fact that these funds were imprudent investment options is not merely evident with the benefit of hindsight.  Rather, it should have been evident from the information already available to Defendants at the relevant times that these funds were imprudent and inappropriate.

33

The fact that Defendants retained these funds in spite of this contemporaneously-available evidence further demonstrates that the process by which the Plan was managed was deeply flawed.

84.     For example, as of the end of 2009, the Plan had approximately $77 million invested in the Deutsche Capital Growth Fund; $15 million in the Deutsche Global Growth Fund; $70 million in the Deutsche Large Cap Value Fund, $51 million in the Deutsche Core Fixed Income Fund, and $20 million in the Deutsche High Income Fund.

85.     In 2009, in plans with over $1 billion in assets, the average expense ratio for domestic equity funds was 0.56%; for domestic bond funds it was 0.38%; and for international equity funds it was 0.77%.   ICI Study at 46.   The expense ratios for the actively-managed proprietary funds within the Plan were higher.   The Plan's two domestic equity offerings, the Large Cap Value and Capital Growth Funds, carried expense ratios of 0.57% and 0.73%, respectively.   The two bond offerings, the Core Fixed Income Fund and High Income Fund, carried expense ratios of 0.55% and 0.67%, respectively.   And the Global Growth Fund carried an expense ratio of 1.13%.

86.     This gap between the expenses charged by the average fund and the expenses charged by the Deutsche Bank proprietary funds grew larger as the proprietary funds became more expensive while mutual fund expenses industry-wide dropped significantly.   For example, in 2012, for plans with over $1 billion in assets, the average domestic equity fund had an expense ratio of 0.48%.   The average domestic bond fund charged 0.35%.   And the average international equity fund charged 0.64%.   Yet, as of the end of 2012, the Plan's two domestic equity offerings, the Large Cap Value and Capital Growth Funds, carried expense ratios of 0.67% and 0.70%, respectively.   The two bond offerings, the Core Fixed Income Fund and High Income Fund,

carried expense ratios of 0.68% and 0.66%, respectively.  And the Global Growth Fund carried an expense ratio of 1.20%.

87.     The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants.  As an example, the fees in the Plan were many times higher than the fees in comparable institutional mutual funds from Vanguard, which many similar plans offer.  Indeed, as shown by the chart below, the fees for the proprietary funds in the Plan were ***more than 11 times more expensive*** than passive index fund alternatives in the same investment style, and 2 to 5 times higher than lower-cost actively managed funds in the same style:

| Fund in Plan | Expense ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Deutsche Capital Growth Instl (SDGTX) | 71 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX) | 6 bps | Large Growth | 1083% |
|  |  | American Funds Growth Fund of American R6 (RGAGX) | 33 bps |  | 115% |
| Deutsche Large Cap Value Instl (KDCIX) | 68 bps | TIAA-CREF Large-Cap Value Idx I (TILVX) | 6 bps | Large Value | 1033% |
|  |  | American Funds American Mutual Fund R6 (RMFGX) | 30 bps |  | 127% |
| Deutsche Global Growth Instl (SGQIX) | 115 bps | Vanguard Total World Stock Index I (VTWIX) | 15 bps | World Stock | 667% |
|  |  | DFA Global Equity I (DGEIX) | 31 bps |  | 271% |

| Fund in Plan | Expense ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Deutsche High Income Instl (KHYIX) | 69 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | High-Yield Bond | 431% |
| Deutsche Core Fixed Income Instl (MFINX) | 64 bps | Fidelity Spartan US Bond Index Advtg Instl (FXNAX) | 5 bps | Intermediate-Term Bond | 1180% |
| | | Metropolitan West Total Return Bond Plan Class (MWTSX) | 39 bps | | 64% |

88.     Despite the high cost of the proprietary investments within the Plan, and the gradual increase of those costs after 2009, Defendants failed to remove the high-cost proprietary mutual funds from the Plan in favor of lower-cost non-proprietary investments such as the funds listed above, even as the fees associated with non-proprietary investment options declined.  This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

89.     Defendants also failed to conduct an impartial review of the performance of each of the proprietary mutual funds, and of the Deutsche Bank funds as a whole, to determine whether it remained prudent for the Plan to retain these proprietary funds.

90.     Had Defendants conducted such a review, it would have revealed that Deutsche Bank had been one of the worst performing mutual fund families in the United States for several consecutive years.  In 2009, 2010, 2011, 2012, 2013, 2014, and 2015, Deutsche Bank was rated among the worst mutual fund companies over the past 5- and 10-year periods, according to

Barron's.[8]  A mutual fund company with consistently low rankings is likely to have an inferior research and management infrastructure in place, making future underperformance highly likely. *See* Carhart, *On Persistence in Mutual Fund Performance*, at 57 (reporting data showing that despite the general arbitrariness and unpredictability of mutual fund returns, the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance). An impartial review of the performance of Deutsche Bank's mutual funds in 2009, and an adequate investigation of available alternatives each year thereafter, would have led a prudent investor to remove the Deutsche Bank mutual funds from the Plan given Deutsche Bank's demonstrably poor track record.  *See Pension Benefit Guar. Corp. ex rel. St. Vincent Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013) (hereinafter "*PBGC*") (providing that a fiduciary breaches the duty of prudence if a superior investment alternative was available and an adequate investigation would have revealed the existence of that alternative).

---

[8] *See* http://s.wsj.net/public/resources/documents/BA-Waddell100201.pdf (2009 Barron's mutual fund rankings with Deutsche Bank ranked 38 out of 54 fund families over the past five years and 38th out of 48 companies over the past ten years); http://www.barrons.com/articles/SB50001424052970204620604576116293104462736 (2010 Barron's mutual fund family rankings with Deutsche Bank ranked 45th out of 53 fund families over the past five years and 41st out of 46 fund families over the past decade); http://www.barrons.com/articles/SB50001424052748703837504577195012375534598 (2011 rankings showing Deutsche Bank 50th out of 53 mutual fund families over the past five years and 42nd out of 45 companies for the past ten years); http://www.barrons.com/articles/SB50001424052748704372504578284113281612952 (Barron's 2012 mutual fund family rankings showing Deutsche Bank 51st out of 53 fund families over the past five years and 41st out of 46 fund families over the past decade); http://www.barrons.com/articles/SB50001424053111904710004579364970231787840 (Barron's 2013 mutual fund family rankings showing Deutsche Bank ranked 51st out of 55 fund families over the past five years and 41st out of 48 fund families over the past decade); http://online.wsj.com/public/resources/documents/FundFam2Tables.B.pdf (Barron's 2014 mutual fund family rankings showing Deutsche Bank ranked 52nd out of 56 fund families over the past five years and 46th out of 48 fund families over the past ten years); http://online.wsj.com/public/resources/documents/BestFundFamilies5-YearAnd10-YearRankings.pdf (Barron's 2015 mutual fund family rankings showing Deutsche Bank ranked 51st out of 58 fund families over the past five years and 48th out of 52 fund families over the past decade).

91.     Given the excessive fees charged by Deutsche Bank's mutual funds and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to DIMA, RREEF, and DSC for their services to the Plan was unreasonably high.

92.     The institution-wide problems with the Deutsche Bank funds was evidenced by the performance of individual Deutsche Bank funds within the Plan.  Two examples relating to the Deutsche Capital Growth Fund and the Deutsche Large Cap Value Fund are particularly telling.

93.     The Deutsche Capital Growth Fund is currently a designated investment alternative within the Plan, and has been since 2007.  The managers of the Deutsche Capital Growth Fund left Deutsche Bank in 2009, and the new manager had no public record managing money.  The new manager underperformed the fund's benchmark index in 2009 by over 11 percent.  A prudent, impartial fiduciary would have removed the Deutsche Capital Growth fund from the Plan at the end of 2009 in light of the unproven new manager and his poor performance since taking over the fund.  Yet, Defendants failed to take this action.  The Deutsche Capital Growth fund then underperformed its benchmark index again in 2010.  According to the fund's annual report, as of September 30, 2010, the Deutsche Capital Growth Fund had underperformed its index over the past 1-year, 3-year, and 5-year periods.  Given this information, a prudent and impartial fiduciary reviewing the Deutsche Capital Growth Fund in 2010 would have removed the fund from the Plan and replaced it with either an index fund or a lower-cost actively managed fund with a superior track record.  *See* Restatement § 90 cmt. b, h(1)–(2); *PBGC*, 712 F.3d at 719.  Defendants' failure to remove the Deutsche Capital Growth Fund at the end of 2009 or during 2010 cost Plan participants millions of dollars due to the resulting poor performance of the fund.  By the end of 2014, of the more than 1,400 defined contribution plans with over $500

million in assets (the Plan had nearly $2.9 billion in assets as of the end of 2014), only one defined-contribution plan included the Deutsche Capital Growth Fund among its core investment options: the Deutsche Bank Matched Savings Plan.

94.     The Deutsche Large Cap Value Fund has suffered similarly poor performance, although the investment's poor performance didn't become apparent until 2010, when the fund underperformed its benchmark index by nearly 5 percent.  The fund again underperformed its benchmark index in 2011 and 2012.  Given three consecutive years of underperformance, it should have been apparent to the Plan's fiduciaries that the Deutsche Large Cap Value fund was no longer a prudent investment.  However, the Plan's fiduciaries did not conduct an impartial review of the Plan's investments in 2012, and the Deutsche Large Cap Value Fund remained in the Plan.  The fund underperformed its benchmark index again in 2013, the fourth consecutive year of underperformance.  Given the Deutsche Large Cap Value Fund's high costs and its poor track record over all relevant time periods, an impartial fiduciary reviewing the Plan's investments in 2013 would have removed the Large Cap Value Fund.  Yet, Defendants failed to remove this imprudent investment in 2011, 2012, and 2013, and as a result of this fiduciary breach, Plan participants have lost tens of millions of dollars that they would have earned in a lower-cost, prudent alternative such as an index fund.  By the end of 2014, of the more than 1,400 defined contribution plans with over $500 million in assets, only one defined contribution plan included the Deutsche Large Cap Value Fund among its core investment options: the Deutsche Bank Matched Savings Plan.

95.     Given the excessive fees charged by the actively-managed Deutsche Bank mutual funds and the funds' poor performance, DIMA's compensation for managing these funds greatly exceeded an amount that would have been reasonable.

96.     Based on the above facts, it is apparent that Defendants' process for reviewing Plan investments was deeply flawed.  Defendants failed to evaluate the institutional capabilities and track record of each investment within the Plan.  Defendants showed favoritism towards Deutsche Bank mutual funds, avoiding removal of Deutsche Bank funds wherever possible.  Even when Defendants did remove proprietary funds from the Plan, the action was taken years after a prudent and impartial fiduciary would have taken the same action.  And Defendants failed to periodically re-assess the long-term performance record of each Plan investment to ensure that the investment remained prudent.  Accordingly, it can be reasonably inferred that the process by which the Plan was managed was flawed.  *PBGC*, 712 F.3d at 718 (holding that a claim for a breach of the duty of prudence is rendered plausible where the circumstantial facts reveal that the plan's investment management process was flawed).

97.     Had Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, they would have removed the Deutsche Bank mutual funds from the Plan in favor of investments such as the Vanguard funds listed above that offered similar or superior performance at significantly less expense.  Instead, Defendants retained the Deutsche Bank funds because they were producing significant revenue for Deutsche Bank, and the Plan assets within each fund provided the proprietary Deutsche Bank funds with superior economies of scale with which to appear more competitive in the marketplace.  By prioritizing Deutsche Bank's interests over Plan participants, Defendants breached the duties of loyalty and prudence.

## III.   DEFENDANTS FAILED TO USE THE LOWEST COST SHARE CLASS OF SEVERAL MUTUAL FUNDS IN THE PLAN

98.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, the more expensive share classes are targeted at

smaller investors with less bargaining power, while the lower-cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than the cost—the funds hold identical investments and have the same manager.

99.     Large defined contribution plans such as the Plan have sufficient assets and negotiating power to qualify for the lowest cost share class available.  A fiduciary to a large defined contribution plan such as the Plan can use its asset size to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will select the lowest-priced share class available.  As the president of a fiduciary advisory company recently stated, failing to use the least expensive class of shares is an "egregious fiduciary breach[]" that "wast[es] plan assets" and is "clearly imprudent."  Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENT NEWS (Jan. 21, 2016), *available at* http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice (emphasis added).

100.     In several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available.

101.     For example, throughout the statutory period, the Plan has held institutional-class shares of all Deutsche Bank funds within the Plan.  Up until 2014, institutional-class shares represented the lowest-cost share class of Deutsche Bank funds available.  In August 2014, however, Deutsche Bank mutual funds introduced a new, lower-cost R6 share class for several funds, including three funds held by the Plan—Deutsche Capital Growth, Deutsche High Income, and Deutsche Real Estate Securities.  As of the end of 2014, the Plan held

approximately $280 million in these three funds.  The chart below shows the expense ratio of each fund's R6 share class compared with the institutional shares in which the Plan was invested:

|  | Exp. Ratio of Institutional Shares | Exp. Ratio of R6 Shares |
|---|---|---|
| Deutsche Capital Growth | 0.71% | 0.60% |
| Deutsche High Income | 0.69% | 0.62% |
| Deutsche Real Estate Securities | 0.63% | 0.55% |

102.    By failing to transfer the Plan's assets in these three funds into R6 shares when they became available in August 2014, from August 2014 to the present Deutsche Bank has dealt with the Plan on a basis that is less favorable to the Plan than its dealings with other shareholders of Deutsche Bank mutual funds.

103.    Because DIMA, a Plan employer and subsidiary of DBAHC (the Plan sponsor), introduced the R6 shares, Defendants  knew or should have known of the existence of R6 shares immediately upon their introduction in August 2014, and therefore also should have immediately known of the prudence of transferring the Plan into R6 shares.

104.    A prudent fiduciary conducting an impartial review of the Plan's investments in late 2014 would have transferred the Plan's investments in these three funds into R6 shares.  Yet, despite the availability of the lower-cost R6 shares, Defendants did not transfer Plan holdings in any of these three funds from institutional shares into R6 shares, in breach of their fiduciary duties.  Because shareholders invested in R6 shares paid less than the Plan's participants paid for the exact same services, Deutsche Bank dealt with other shareholders on a more favorable basis than it dealt with the Plan's participants.

105.    The Plan also has been invested in institutional shares of the Lord Abbett Developing Growth mutual fund since 2011.  As of the end of 2014, the Plan had $170 million

invested in the Developing Growth fund.  In June 2015, Lord Abbett introduced R6 shares of the Developing Growth fund that cost significantly less than the institutional shares; the institutional shares have an expense ratio of 0.73%, while the R6 shares have an expense ratio of only 0.60%. A prudent fiduciary conducting a quarterly review of Plan investments would monitor the Plan's expenses to ensure that the Plan is invested in the lowest-cost mutual fund share class available. Yet, Defendants failed to monitor the Plan's investments to ensure that the Plan was invested in the lowest-cost share class available, and have not transferred the Plan's investment in the Lord Abbett Developing Growth fund into R6 shares of the fund.

106.    In addition, the Plan had approximately $103 million invested in institutional shares of the Goldman Sachs Mid Cap Value Fund at the end of 2014.  On July 31, 2015, Goldman Sachs introduced R6 shares, a new, lower-cost class of shares.  For 2015, the expense ratio of R6 shares was 0.72%, compared with an expense ratio of 0.74% for institutional shares. A prudent fiduciary conducting a quarterly review of Plan investments would have discovered that a lower-cost share class was available, and would have transferred the Plan's investment in the Goldman Sachs Mid Cap Value Fund from institutional shares into R6 shares of the fund. However, Defendants failed to do so.

107.    As a further example, in 2009, the Plan added the MFS Value Fund as a designated investment alternative and invested in R4 shares, which had an expense ratio of 0.77%.  At the time, R4 shares were the cheapest share class available of the MFS Value Fund. In 2012, however, MFS introduced the R5 share class of the MFS Value Fund, which charged only 0.60%, while the R4 shares in 2013 charged 0.69%.  A prudent fiduciary reviewing the Plan's investments in 2012 would have transferred the Plan out of R4 shares and into R5 shares of the MFS Value Fund.  However, Defendants failed to conduct such a review.  As of the end of

2014, the Plan's $19 million invested in the MFS Value Fund remained invested in R4 shares of the Fund, despite the fact that R4 shares have an expense ratio of 0.65%, and the R5 shares charge investors only 0.55%.

## IV. DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

108.   Aside from selecting proprietary mutual funds that charged excessive fees and had a track record of poor performance, Defendants also failed to adequately investigate non-mutual fund alternatives such as collective trusts and separately managed accounts.

109.   According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, are available to "large plans … with total assets of over $500 million[.]"   *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.   By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."   *Id*.

110.   Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees and greater control by the plan sponsor or fiduciary over the investment guidelines.

111.   While certain of the Plan's investment options utilize institutional share classes, costs within separate accounts are typically much lower than even the institutional share class of mutual funds.

112.   For example, Deutsche Bank itself offers its institutional clients separately-managed accounts in the same investment styles as the Plan's proprietary mutual funds, including the Deutsche Large Cap Value, Capital Growth, and Real Estate Securities funds. Deutsche Bank's advertising materials state that the minimum investment for these separate accounts is $25 to $30 million, with fee schedules that decline as assets increase.  The Plan's

proprietary funds generally far exceed that threshold.  For example, the Plan has over $100 million invested in each of the three proprietary funds mentioned above.

113.    Deutsche Bank's advertised fee schedule for the Large Cap Quality Growth separate account starts at 60 basis points, declines to 50 basis points on incremental assets between $20 and $50 million, declines to 40 basis points on assets between $50 and $100 million, and declines again to 30 basis points on assets over $100 million.  Based on the Plan's $132 million investment in the Deutsche Capital Growth Fund (which has an identical investment objective), the Plan would have paid only 43 basis points under the separate account fee schedule.  Instead, the Plan remained invested in the Deutsche Capital Growth mutual fund, which charged investors 71 basis points in 2014.  Thus, Defendants could have reduced the Plan's expenses by approximately 40 percent by converting this mutual fund to a separate account.

114.    Similarly, Defendants could have reduced the expenses paid in the Deutsche Large Cap Value fund from 68 to 47 basis points by converting the mutual fund to the separate account structure advertised by Deutsche Bank to its institutional clients.

115.    Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.  Accordingly, the fee savings that Defendants could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules.

116.    Moreover, Collective trusts also would have provided much lower investment management fees than the Plan's mutual funds. Collective trusts are a common investment vehicle in large

401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, Wall St. J. (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.  Due to their potential to reduce overall plan costs, collective trusts are becoming the norm within larger defined contribution plans.  *See* ICI Study at 35 (reporting that in plans with over $1 billion in assets, by the end of 2013 more assets were held in collective trusts than in mutual funds).

117.    According to the investment consulting firm Callan Associates Inc., for plans with over $1 billion in assets, collective trusts charge an average of 54 basis points.  Based upon this average, for each of the Plan's actively-managed mutual funds, use of a collective trust structure would have reduced the fees charged to Plan participants by between 10 and 63 basis points.

118.    Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. By failing to investigate the use of these institutional alternatives for the Plan's actively managed funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. Furthermore, by offering these institutional investment vehicles to shareholders in other plans but not offering them to the Plan's participants, Deutsche Bank dealt with other shareholders on a more favorable basis than the Plan's participants.

## V.    DEFENDANTS FAILED TO MONITOR OR CONTROL THE PLAN'S RECORDKEEPING EXPENSES.

119.    Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

120.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

121.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

122.    Plans must implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

123.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a responsible fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed

reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

124.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process every three to five years as a matter of course, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

125.    Defendants have a long history of using the Plan's recordkeeping relationship to promote Deutsche Bank's interests.  Until August 2003, Defendants used Fidelity as the Plan's recordkeeper. During this time, the Plan was stocked with 10 or more investment funds managed by Fidelity.  Using Fidelity's funds in the Plan was a way to ensure revenue sharing covered the Plan's administrative fees, providing Deutsche Bank the security of knowing it would not have to cover the recordkeeping bill and the favor of employees who believed they received administrative services at no extra charge.

126.    Between 2001 and 2003, Deutsche Bank was busy making deals in the retirement plan services space.  Deutsche Bank acquired Scudder Investments, including its Scudder Retirement Plan Services division, and then sold the Retirement Plan Services division to ADP. As part of the sale to ADP, Deutsche Bank and ADP formed a "Benefits Services Alliance", with Deutsche Bank retaining "an undisclosed interest in future bundled defined contribution and total outsourcing business" between Scudder and ADP.[9]  In essence, Deutsche Bank entered into a partnership with ADP to sell recordkeeping and trustee services to other defined contribution

---

[9] *See* Arleen Jacobius, *Bundled providers selling off record keeping*, PENSION & INVESTMENTS (May 12, 2003), available at www.pionline.com/article/20030512/PRINT/305120706/bundled-providers-selling-off-record-keeping.

plans. The Plan's recordkeeping contract changed hands at this very same time—from Fidelity to Deutsche Bank's new partner ADP.  After the change, the Plan underwent a makeover to align with Deutsche Bank's new business interests, and ALL of the Fidelity investments offered in the Plan were eliminated, while a large number of newly-acquired Scudder mutual funds were added.

127.    Based on Plaintiffs' investigation and analysis, a normal range of recordkeeping fees for a plan the same size as the Plan (approximately 20,000 participants with account balances throughout the putative class period) would have been between $45 and $50 per participant from 2010 to 2012, and between $35 and $45 per participant from 2013 to the present.

128.    The recordkeeping fees paid by the Plan to Deutsche Bank's close business partner and ally, ADP, greatly exceeded this reasonable range.  Until February 2013, ADP received revenue sharing compensation equal to more than $100 per participant, more than twice a reasonable recordkeeping fee.  The Plan's investment lineup consistently produced the same level of revenue sharing compensation to ADP, so a prudent fiduciary would have observed the windfall and taken corrective action.  However, Defendants took no corrective action and instead allowed the gross overpayments to be retained by ADP, rather than returning excess payments to Plan participants.  Defendants abdicated their duties to prudently monitor compensation paid to ADP, allowing conflicting loyalties between ADP and the Plan to intervene to the Plan's detriment.

129.    ADP's revenue sharing compensation remained excessive after February 2013. When Defendants could no longer delay replacing the Plan's overpriced Deutsche Bank index funds with non-proprietary alternatives in February 2013, ADP's rate of recordkeeping

compensation decreased to about $80 per participant, as the new non-proprietary index funds did not pay revenue sharing.  However, this was not sufficient to bring ADP's compensation within the reasonable market range, which had decreased to $35 to $45 per participant.  Indeed, Defendants still allowed ADP to keep more than two times the reasonable rate.

130.   Defendants' failures to monitor and control ADP's recordkeeping compensation cost the Plan between approximately $800,000 and $1.3 million per year and constituted breaches of the duties of loyalty and prudence.

## VI.   PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

131.   Plaintiffs did not have knowledge of all material facts (including, among other things, the level of the Plan's recordkeeping fees, comparisons of the Plan's recordkeeping expenses to other similarly-sized plans, investment fees and investment performance versus other available alternatives; comparisons to other similarly-sized plans; information regarding other available share classes; and information regarding separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, Defendants' processes for selecting, monitoring, and removing the Plan's recordkeeper, and Defendants' process for monitoring the Plan's recordkeeping expenses and the reasonableness of those expenses, because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Second Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

132.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).  Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

133.    Plaintiffs Ramon Moreno and Donald O'Halloran assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[10]

> All participants and beneficiaries of the Deutsche Bank Matched Savings Plan at any time on or after December 21, 2009, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

134.    Numerosity:   The Class is so numerous that joinder of all Class members is impracticable.  The Plan has had between 19,000 and 22,000 participants with account balances during the applicable period.

135.    Typicality:    Plaintiffs' claims are typical of the Class members' claims.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members with regard to the Plan.  Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

136.    Adequacy:    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation.  Plaintiffs do not have any

---

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

137.    Commonality:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.  Which Defendants are fiduciaries of the Plan;

      b.  Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

      c.  Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

      d.  Whether the Plan engaged in prohibited transactions in violation of 29 U.S.C. § 1106;

      e.  Whether DBAHC, O'Connell, and the Executive Committee and its members breached their duty to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      f.  The proper form of equitable and injunctive relief; and

      g.  The proper measure of monetary relief.

138.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

139.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan

fiduciary, would be dispositive of non-party participants' interests.  The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

140.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct as described in this Second Amended Complaint applied uniformly to all members of the Class.  Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

141.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

142.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

143.   The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Further, Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.  This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

144.   As described throughout the Second Amended Complaint, Defendants failed to monitor the Plan's investments to ensure that each of the Plan's investments remained prudent, and failed to remove those investments that were no longer prudent.  Defendants retained proprietary index funds as Plan investments despite the availability of identical investments from other mutual fund companies that would have cost Plan participants as much as eleven times less than they were charged by the Deutsche Bank proprietary index funds.  Defendants retained proprietary actively-managed funds despite their excessive costs and their poor performance history relative to other similar investments that were available in the marketplace.  A prudent fiduciary in possession of this cost and performance information would have removed the Deutsche Bank funds from the Plan as early as the end of 2009, and at the very latest by 2012. Defendants also failed to monitor Plan investments to ensure that the Plan was invested in the lowest-cost share class of each mutual fund within the Plan, and failed to transfer Plan investments into lower-cost share classes when those cheaper share classes became available. Further, Defendants failed to investigate the availability of separate accounts and collective trusts

for the actively-managed mutual funds within the Plan, and failed to transfer from mutual funds into a separate account or collective trust structure even though doing so would have saved Plan participants millions of dollars in fees.  Defendants likewise failed to monitor or control the grossly-excessive compensation paid for recordkeeping services to Deutsche Bank's close business partner, ADP.

145.   Each of the above-mentioned imprudent actions and failures to act in a prudent manner illustrate Defendants' failure to monitor the Plan and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Deutsche Bank.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

146.   Through the actions and omissions described *supra* in paragraph 132 and elsewhere in this Second Amended Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

147.   Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made

through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

148.    Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

<u>**COUNT II**</u>
**Prohibited Transactions with Party in Interest**
**29 U.S.C. § 1106(a)(1)**

149.    As Plan employers and service providers for the Plan, DIMA, RREEF, and DSC are parties in interest under 29 U.S.C. §§ 1002(14).  As a Plan employer and the corporate parent of multiple service providers for the Plan, DB AG is also a party in interest.  Finally, as a Plan employer, the Plan sponsor, and the direct owner of DIMA and RREEF, DBAHC is a party in interest.

150.    As described throughout the Second Amended Complaint, Defendants caused the Plan to utilize high-cost investments that generated revenue for Deutsche Bank.

151.    On a monthly basis throughout the relevant period, DIMA deducted fees and expenses from the assets being held for the Plan that were invested in Deutsche Bank-affiliated mutual funds.  In the Deutsche Real Estate Securities Fund, a portion of these fees and expenses were paid to RREEF.  DSC also was periodically paid shareholder service fees from the assets being held for the Plan that were invested in Deutsche Bank-affiliated mutual funds.  These fees

and expenses were paid in exchange for the investment management services provided to the Plan by DIMA and RREEF, and the various services provided by DSC.

152.    As noted throughout the Second Amended Complaint, the compensation paid to these parties in interest was unreasonably high.  Further, as discussed above, DIMA's and RREEF's provision of investment management services and DSC's provision of transfer agent, dividend-paying, and shareholder services was on a basis that was less favorable to Plan participants than their dealings with other shareholders.  Accordingly, these transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1).

153.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

154.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions.

### COUNT III
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)**

155.    As described throughout the Second Amended Complaint, DBAHC is a fiduciary of the Plan as that term is used in 29 U.S.C. §§ 1002(21) and 1106(b).

156.    DBAHC dealt with the assets of the Plan in its own interest and for its own account by causing the Plan to pay investment management fees and expenses to DIMA and RREEF (DBAHC's subsidiaries) out of Plan assets, in violation of 29 U.S.C. § 1106(b)(1).

157.    DBAHC received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.  These transactions took place when fees and expenses were deducted from assets being held for Plan participants in exchange for the investment management services performed by DIMA and RREEF.  These payments to DIMA and RREEF constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

158.    Based on the foregoing facts and the other facts set forth in this Second Amended Complaint, Defendants knowingly caused the Plan to engage in prohibited transactions by failing to remove Deutsche Bank mutual funds as designated investment alternatives, and are therefore liable for the prohibited transactions as co-fiduciaries.

159.    Based on the foregoing facts and other facts set forth in the Second Amended Complaint, Defendants are liable for violations of 29 U.S.C. § 1106(b) because they knowingly participated in these prohibited transactions, and made no efforts to prevent these transactions despite having knowledge that the prohibited transactions were taking place.

160.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

161.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions.

## COUNT IV
### Failure to Monitor Fiduciaries

162.    As alleged throughout the Second Amended Complaint, Defendants are fiduciaries of the Plan.

163.    DBAHC had overall oversight responsibility for the Plan, control over the Plan's investment options through its authority to negotiate and amend the Trust Agreement, explicit responsibility for appointing and removing members of the Executive Committee, authority to hire or terminate AHIC, and the authority to hire and fire the employees who were ultimately appointed as members of the Investment Committee.   DBAHC therefore had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Executive Committee, the Investment Committee, and AHIC.

164.    The Executive Committee was responsible for directly overseeing the actions of the Investment Committee and AHIC, appointing and removing members of the Investment Committee, and appointing and removing AHIC.   The Executive Committee had a fiduciary responsibility to monitor the other fiduciaries, including the Investment Committee, its individual members, and AHIC.

165.    As the Plan Administrator, O'Connell was responsible for establishing and administering rules and procedures with respect to all matters relating to the selection and monitoring of designated investment alternatives within the Plan.   O'Connell also was responsible for monitoring the performance of all DBAHC employees who performed functions for the Plan and for monitoring the performance of AHIC.   As a result of these responsibilities, O'Connell had a fiduciary responsibility to monitor other Plan fiduciaries and ensure compliance with ERISA.

166.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

167.   To the extent that DBAHC's, O'Connell's, or the Executive Committee's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

168.   DBAHC, O'Connell, and the Executive Committee breached their fiduciary monitoring duties by, among other things:

a)   Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of Defendants' imprudent actions and omissions;

b)   failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment the Plan's fiduciaries were giving to Deutsche Bank-affiliated mutual funds in their process of selecting and monitoring the Plan's investments; the fiduciaries' failure to investigate the availability of lower-cost share classes; the failure to investigate the availability of lower-cost separate account and collective trust vehicles, and the failure to investigate in a timely fashion the availability of lower-cost alternatives to the Deutsche Bank index funds held by the Plan;

c)   failing to monitor the transactions of the Plan to ensure that the Plan was not entering into any prohibited transactions; and

d)   failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

     e)  failing to monitor the recordkeeping fees incurred by the Plan to ensure the Plan was paying no more than the reasonable value of the services provided by the Plan's recordkeeper.

169.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

170.    Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), DBAHC, O'Connell, and the Executive Committee are liable to restore to the Plan all losses suffered as a result of the fiduciary breaches and prohibited transactions that resulted from their failure to properly monitor the Plan's fiduciaries.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Deutsche Bank Matched Savings Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

E.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F.      An accounting for profits earned by Defendants and a subsequent order requiring Defendants to disgorge all profits received from, or in respect of, the Plan;

G.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all Plan assets transferred to Defendants as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Defendants to prevent their unjust enrichment and to compensate the class for Defendants' violations of ERISA;

H.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

J.      An award of pre-judgment interest;

K.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

L.      An award of such other and further relief as the Court deems equitable and just.

Dated: January 3, 2017           **NICHOLS KASTER, PLLP**

/s/ Kai H. Richter
Michele R. Fisher, NY Bar Code # MF4600
Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
*admitted *pro hac vice*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
fisher@nka.com
krichter@nka.com
cengstrom@nka.com

ATTORNEYS FOR PLAINTIFFS